**BOUTIN JONES INC.**
Robert D. Swanson (CA Bar No. 162816)
Daniel S. Stouder (CA Bar No. 226753)
555 Capitol Mall, Suite 150
Sacramento, CA 95814-4603
Telephone:  (916) 321-4444
Facsimile:  (916) 441-7597
dstouder@boutinjones.com
rswanson@boutinjones.com

**DUNLAP CODDING PC**
Douglas J. Sorocco (OK. Bar 17347,
 Ill. ARDC 2381747);
*pro hac vice* forthcoming
Evan W. Talley (OK Bar 22923)
*pro hac vice* forthcoming
609 West Sheridan Avenue
Oklahoma City, OK 73102
Telephone: (405) 607-8600
Facsimile: (405) 607-8686
dsorocco@dunlapcodding.com
etalley@dunlapcodding.com

*Attorneys for Plaintiff*
*Guardian Alliance Technologies, Inc.*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

### SACRAMENTO DIVISION

| | |
|---|---|
| GUARDIAN ALLIANCE TECHNOLOGIES, INC., a California corporation;<br><br>           Plaintiff,<br>vs.<br><br>MILLER MENDEL, INC., a Washington corporation; and TYLER MILLER, an individual;<br><br>           Defendants. | **Case No.:**<br><br>**COMPLAINT**<br><br><br><br><br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, GUARDIAN ALLIANCE TECHNOLOGIES, INC. ("Guardian"), for its claims

and relief against Defendants MILLER MENDEL, INC. ("MMI") and Tyler Miller ("Miller")

(collectively "Defendants") alleges:

/ / /

/ / /

1

1260427.3

## NATURE AND OVERVIEW OF THE ACTION

1.    Since entering the market for public safety background management software in 2011, Defendants have used their ill-gotten patent portfolio in an attempt to obtain a monopoly in the market and exclude others from meaningfully competing. By procuring contracts and stifling competition based on their fraudulently-obtained patent portfolio, Defendants have experienced millions of dollars in ill-gotten gains, and public safety agencies interested in the goods and services sold by Defendants have been subjected to increased costs and expenses, all to the detriment of competition in the marketplace.

2.    In 2018, when Guardian entered the market, and when the second of Defendants' fraudulently-obtained patents was issued, Defendants set a course of repeatedly suing Guardian's public safety agency customers for patent infringement and threatening suits against any agency who chose to use or continues using the Guardian software. Defendants have sued four Guardian public safety agency customers in venues across the United States and threatened scores of Guardian's other current and prospective customers. Even after the United States District Court for the Eastern District of Texas invalidated Defendants' asserted patent claims, Defendants continue to threaten the marketplace to intimidate Guardian's current and prospective customers into terminating or not entering into contracts with Guardian to use its software.

3.    This action, therefore, seeks to hold Defendants liable under federal antitrust and patent laws, as well as under the laws of the State of California, for unlawfully attempting to monopolize the national market for public safety background management software through the assertion and threatened assertion of their fraudulently-obtained patent portfolio, and other sham litigation tactics. Further, Defendants have committed acts of unfair competition, including trade libel, that have harmed Guardian's commercial reputation and ability to compete in the public safety background management software market.

## THE PARTIES

4.    Plaintiff Guardian is a California corporation with its principal place of business at 11 S. San Joaquin St., Ste. 804, Stockton, California 95202.

/ / /

COMPLAINT

1260427.3

5.    On information and belief, Defendant MMI is a Washington corporation with its principal place of business at 1425 Broadway, Ste. 430, Seattle, Washington 98122.

6.    On information and belief, Defendant Miller is a resident of the State of Washington.

**JURISDICTION AND VENUE**

7.    This is an action for monetary damages and injunctive relief under: (a) Section 2 of the Sherman Act, (b) Section 4 of the Clayton Act, (c) the Patent Act, and (d) the laws of the State of California. These counts arise from the Defendants' unlawful and anti-competitive campaign to illegally monopolize the market for public safety background investigation software.

8.    This Court has subject matter jurisdiction over this action under at least 28 U.S.C. §§ 1331, 1338, 2201, and 2202, pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2; Section 4 of the Clayton Act, 15 U.S.C. § 15; and the Patent Act, Title 35 of the United States Code. Given this subject matter jurisdiction over these Federal Question claims, this Court further has supplemental jurisdiction over the California statutory and common law claims pursuant to 28 U.S.C. § 1367.

9.    Defendants are subject to this Court's personal jurisdiction because they have and continue to conduct substantial business within the State of California, including actions intertwined with Guardian's causes of action against Defendants. In particular, Defendants have used their fraudulently-obtained patents and threats of patent infringement to contract with and/or tortiously interfere with Guardian's contractual relationships with, *inter alia*, the California Department of Corrections, the San Joaquin (CA) County Sheriff's Office, the Kern County (CA) Sheriff's Office, the Placer County (CA) Sheriff's Office, and the Fresno (CA) Police Department.

10.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in this District.

**INTRODUCTION**

11.    Public safety background investigation management software consists of specialized software, often cloud-based and delivered as Software-as-a-Service (SAAS) to clients, designed to enable public safety organizations, such as local, state, and federal law enforcement

COMPLAINT                                                                                          1260427.3

agencies, to complete pre-employment background investigations of job applicants much more efficiently and accurately, thereby facilitating more efficient, high-quality hiring decisions.

12.     To monopolize or attempt to monopolize the market for background investigation management software, Defendants unlawfully obtained, based on fraud on the United States Patent and Trademark Office (USPTO), several patents on background investigation management software (the "MMI Patent Portfolio"). Specifically, and as set forth below, Defendants obtained the MMI Patent Portfolio by concealing material facts from the USPTO and, at the same time, making affirmative false statements to the USPTO to persuade it to grant the patents in the MMI Patent Portfolio.

13.     With the competitive benefits conferred by the MMI Patent Portfolio, Defendants actively suppressed competition by (a) extensively advertising the existence of and aggressively threatening enforcement of the MMI Patent Portfolio against competitors and their own existing and potential customers and (b) actively enforcing the MMI Patent Portfolio against their own prospective customers—i.e., bringing suit against law enforcement agencies that are or were existing Guardian customers at the time of the lawsuits. Defendants' actions were made with full knowledge that their enforcement activities and threatening statements were wholly predicated upon the enforcement of the fraudulently-obtained MMI Patent Portfolio. Defendants knew, therefore, that their actions were objectively baseless.

14.     Using the fraudulently-obtained MMI Patent Portfolio and by engaging in the preceding anti-competitive activities, Defendants suppressed competition and attempted to obtain a monopoly in the market for public safety background investigation software ("Public Safety Background Investigation Software Market" or "the Market"). At a minimum, Defendants' misuse, through enforcement, of the fraudulently-obtained MMI Patent Portfolio presented and continues to present a dangerous probability that Defendants will succeed in obtaining an improper monopoly in the Market.

15.     As the central plank of their anti-competitive activities, Defendants' enforcement campaign currently includes the institution of four lawsuits against Guardian customers, dating back to 2018. Additionally, since at least 2018, MMI has directly threatened enforcement of the

COMPLAINT                                                                                    1260427.3

fraudulently-obtained MMI Patent Portfolio to many of Guardian's existing customers and the Market as a whole—i.e., prospective Guardian customers.

16.    Through their campaign of enforcing the fraudulently-obtained MMI Patent Portfolio, tortiously interfering in Guardian's contractual relationships, and knowingly spreading false and defamatory statements about Guardian, Defendants have stifled competition within the Market, thereby obtaining control of a significant portion of the Market through unfair, anti-competitive, and monopolistic conduct.

17.    This lawsuit seeks to restore competition to the affected market and to compensate Guardian for the injuries Defendants' unfair, anti-competitive, and monopolistic conduct has caused.

18.    In particular, Guardian seeks compensation for its injuries resulting from Defendants' pursuit of baseless enforcement of the fraudulently-obtained MMI Patent Portfolio and for other economic and non-economic damages Guardian has suffered due to Defendants' anti-competitive behavior.

A.    **The Public Safety Background Investigation Management Software Industry and the Relevant Market**

19.    Nearly 19,000 law enforcement agencies in the U.S. (at the local, state, and federal levels) perform over 1.7 million pre-employment background investigations annually.

20.    Public safety organizations perform pre-employment background investigations by trained, professional background investigators. They are not the same as, nor should they be confused with, basic background checks that can be readily ordered online for employment or rental purposes, for example.

21.    A complete public safety pre-employment background investigation consists of an extensive array of applicant information as required by the Police Officer Standards and Training (POST) or POST-equivalent authority in every jurisdiction in the United States.

22.    Over 98% of law enforcement agencies still collect, manage and store background investigation information in hard copy.

/ / /

COMPLAINT                                                                                              1260427.3

23.     Completed hard copy public-safety background investigations generally consist of 200–300 pages of paper documents. They include up to 17 different "tabs" or sections, each with a different focus or purpose within the comprehensive background investigation.

24.     Collecting, collating, evaluating, and storing background information in hard copy results in numerous wasted resources, including the costs of maintaining storage space for paper records (typically held in 3–4" three-ring binders) that must be physically stored for years in most instances. Unlike electronic records, paper documents don't provide any ability to gain insight into who is seeking employment (either within the agency itself or cross-agency), and the paper documents cannot be readily shared within or outside the agency performing the background investigation.

25.     As an example, the tabs in a public safety background investigation in California include:  (a) a Background Narrative Report; (b) a Personal History Statement (20-plus pages, over 200 data points); (c) DOJ/FBI Fingerprint Returns and Firearms Clearance; (d) Driving Record Check; (e) Local Law Enforcement Agency Record Checks; (f) Credit Record Checks; (g) Education Verification; (h) Citizenship/Age Verification; (i) Military History Check; (j) Dissolution of Marriage Check; (k) Employment History Checks; (l) Relatives/Personal Reference Checks; (m) Neighborhood Checks; (n) Medical/Psychological Clearances; and (o) Other Documentation.

26.     By using specialized public safety background investigation management software, agencies can complete pre-employment background investigations faster and more accurately—thereby facilitating more efficient, high-quality hiring decisions.

27.     While the public safety background management software assists agencies in expediting the completion of public safety background investigations, the anatomy of such investigations must remain intact as prescribed by the POST or POST-equivalent authority. The public safety background management software streamlines the performance of a prescribed, well-understood process.

/ / /

/ / /

COMPLAINT                                                                                          1260427.3

28.     MMI, and its competitors like Guardian, offer public safety background investigation management software to customers nationwide in the United States. As a result, the scope of the relevant geographic market for this Complaint is the entirety of the United States.

29.     Despite systems that existed before MMI entered the Market, MMI was able to capture a dominant position quickly and is currently the dominant Market participant, controlling at least 70% of the total dollars expended annually by public safety agencies for public safety background investigation management software.

30.     Until Guardian was formed and entered the Market in 2018, MMI's two main competitors in the Market were: (a) Essential Software Development, LLC, which has offered its Police Officer Background Investigation Tracking System ("POBITS") software since no later than 2010; and (b) Background Solutions, LLC, which has offered its Background Assistant software since no later than 2009.

31.     MMI obtained its dominant position in the Market through monopolistic activities, including: (a) extensively advertising the existence of and aggressively threatening enforcement of the MMI Patent Portfolio and (b) actively enforcing the MMI Patent Portfolio against MMI's own prospective customers–i.e., bringing suit against law enforcement agencies that are or were existing Guardian customers at the time of the lawsuits.

32.     Since Guardian entered the Market in 2018, MMI has increased its share of the Market as a result of its litigation activities as well as its increasing threats of litigation against public safety agencies who might use or consider using Guardian's software, including capturing business from prospective law enforcement agencies who were already committed to purchasing the Guardian system and, during the process of completing contracts or, in at least one instance, had entered into a contract with Guardian, walked away from or terminated their agreement with Guardian after being threatened by MMI.

**B.     Defendants' Fraudulently Obtained Patent Portfolio and Their Anti-Competitive Conduct in Enforcing Such Patents**

33.     Over the past decade, MMI fraudulently obtained two patents from the United States Patent & Trademark Office ("USPTO," the federal agency charged with examining and

7

1   issuing patents where warranted), United States Patent Nos. 9,070,098 ("the '098 Patent") and

2   10,043,188 ("the '188 Patent"). MMI is continuing its fraud while applying for two additional

3   patents, i.e., United States Patent Application Nos. 16/024,622 ("the '622 Application") and

4   17/316,686 ("the '686 Application") (collectively, with the '098 and '188 Patents, "the MMI Patent

5   Portfolio"). True and correct copies of the '098 and '188 Patents are attached hereto as Exhibits 1

6   and 2, respectively.

7          34.     As detailed below, Defendants deliberately and purposefully withheld material

8   information (i.e., the fraud committed on the USPTO)—with such withheld material comprising:

9   (a) its own offer to sell its invention more than a year before filing for its first patent application;

10  and (b) information about third-party prior art systems of which Defendants were aware. Despite a

11  duty to disclose this prior art information, Defendants purposefully and deliberately withheld this

12  prior art information from the USPTO to keep this prior art information from the USPTO, as it was

13  material to patentability, and the USPTO would have rejected Defendants' patent applications as

14  unpatentable had the agency been aware of the existence of the prior art information. Moreover,

15  Defendants made numerous false statements to the USPTO, the falsity of which was material to the

16  patentability of their various patent applications. In light of these false statements, the USPTO

17  found the Defendants' applications patentable and allowed them to issue. Pointedly, not only were

18  Defendants' statements false, Defendants knew that the statements were false when they were made.

19         35.     Finally, Defendants' fraud on the USPTO is ongoing. To date, the Defendants have

20  not disclosed the prior art information to the USPTO in its pending patent application, and the

21  Defendants continue to make knowingly false statements in their attempts to persuade the USPTO

22  to allow its pending applications to issue as patents.

23         36.     Defendants' false representations and omissions of material facts and prior art were

24  intended by Defendants to induce and did induce reliance by the patent examiners (i.e., the

25  individuals charged within the USPTO in determining whether to grant Defendants' patent claims)

26  into allowing the patent applications to issue. But for Defendants' false representations and knowing

27  omissions of material facts and prior art, the patents within the MMI Patent Portfolio would not

28  have been issued.

COMPLAINT                                                                                    1260427.3

37. Defendants' false representations and knowing omissions of material facts and prior art constitute inequitable conduct, otherwise known as "fraud on the USPTO," thereby rendering each of the claims of the issued patents within the MMI Patent Portfolio invalid and unenforceable.

38. After fraudulently obtaining the patents within the MMI Patent Portfolio from the USPTO, Defendants advertised the existence of the MMI Patent Portfolio, threatened to enforce, and, after that, actually enforced one of the fraudulently-obtained patents within the MMI Patent Portfolio against users of Guardian's public agency background investigation management software—i.e., Defendants are currently enforcing the fraudulently-obtained patents against potential MMI customers that chose Guardian's software instead of MMI's. Notably, MMI did not directly litigate its fraudulently-obtained patents within the MMI Patent Portfolio against Guardian—choosing instead to sue its potential customers, i.e., public law enforcement agencies generally unfamiliar with patent litigation and risk-averse due to public oversight. By doing so, Defendants could obtain, maintain, or, at a minimum, pose a dangerous probability of obtaining a monopoly in the Market through the enforcement (and threatened enforcement) of fraudulently-obtained patent claims in the MMI Patent Portfolio.

39. The MMI Patent Portfolio provides a critical competitive strength to Defendants, albeit a strength obtained through fraud on the USPTO. The MMI Patent Portfolio allows Defendants to erect artificial barriers to entry and pursue their expansion in the Market without competition. For example, "sole-source" justification exists when a vendor offers services or goods to a public safety agency purportedly covered by one or more patents. The vendor is considered the "sole-source" of the goods or services. The fraudulently-obtained MMI Patent Portfolio allows Defendants' services to be classified as sole-source, thereby allowing Defendants to circumvent a public safety agency's request for proposal ("RFP") process. This circumvention is contrary to the public policy favoring competitive bidding for goods and services. The barrier created by Defendants' use of the fraudulently-obtained MMI Patent Portfolio to achieve sole-source status prevents (and has prevented) Guardian, as well as other competitors, from competitively offering its goods and services to the public safety agency through participation in an agency's RFP process. Defendants' monopolistic actions have prevented Guardian, and other competitors from being

COMPLAINT                                                                                      1260427.3

1  awarded the contract by winning a public safety agency RFP. Defendants used their fraudulently-

2  obtained MMI Patent Portfolio to deceive the agencies into granting it sole-source status to the

3  detriment of the agency, the tax-payers supporting the agency, other competitive public agency

4  background investigation management software vendors, and Guardian.

5      40.     In furtherance of this scheme, Defendants initiated the Oklahoma, Oregon, Alaska,

6  and Texas Actions. Defendants have threatened at least 100 of Guardian's existing and prospective

7  customers with claims that they infringed claims of at least the '188 Patent.

8      41.     Defendants' objectively baseless lawsuits (i.e., those actions filed against

9  Guardian's customers seeking enforcement of the MMI Patent Portfolio) have required Guardian to

10  expend significant time and financial resources honoring its contractual patent infringement

11  indemnification obligations to its customers that MMI has sued.

12      42.     Even after Guardian's customer—the City of Oklahoma City—articulated in

13  December 2020 the precise reasons for Defendants' fraud on the USPTO (i.e., Miller, MMI, and

14  their counsel's failure to disclose the prior art information), Defendants have continued in their anti-

15  competitive scheme of attempted monopolization by suing additional Guardian customers in

16  Oregon, Alaska, and Texas.

17      43.     Further, despite Guardian's customer—the City of Oklahoma City—making MMI,

18  Miller, and their counsel explicitly aware of (a) MMI's own prior sale, and (b) prior art software

19  systems, Defendants have continued their practice of committing fraud on the USPTO by failing to

20  disclose this prior art information in the ongoing prosecution of the pending patent applications in

21  the MMI Patent Portfolio. Such fraud is ongoing as of this filing despite the Defendants' ongoing

22  duty to disclose this prior art information under 37 C.F.R. § 1.56. It should not be overlooked,

23  Defendants' counsel, which has been made aware of this prior art information, has its own separate

24  ethical obligation and duty under 37 C.F.R. § 1.56 to disclose this prior art information to the

25  USPTO.

26      44.     MMI and Miller's threats of enforcement of the fraudulently-obtained MMI Patent

27  Portfolio against Guardian's customers continued even after the Court in the Texas Action

28  invalidated the asserted claims of the '188 Patent under 35 U.S.C. § 101—insisting to Guardian's

COMPLAINT                                                                    1260427.3

actual and prospective customers that **all claims** of the '188 Patent remained in full force and effect. MMI and Miller's actions went so far as issuing a press release with the headline: "Miller Mendel's eSOPH Patent Remains in Full Effect After Judge's Decision." This statement is misleading, and a false, anti-competitive, and monopolistic misstatement meant to deceive the market into avoiding contracting with Guardian.

45.    Defendants' persistent and costly assertion of the fraudulently-obtained patents within the MMI Patent Portfolio against Guardian and its customers, in light of the circumstances by which those patents were obtained and how they were enforced, is a crucial part of the pattern of unfair, anti-competitive, and monopolistic conduct perpetrated by Defendants.

46.    Defendants should be held responsible for their misconduct in obtaining patents fraudulently, for subjecting Guardian to the unnecessary expense of multiple, protracted patent litigations, and for MMI's use of its patent portfolio to reap anti-competitive benefits in the marketplace.

47.    Defendants' anti-competitive conduct has harmed competition in the public safety background investigation software market by, among other things, affecting prices and reducing competition, quality, innovation, and consumer choice.

C.    **Defendants' Actions Constituting Inequitable Conduct and Fraud on the United States Patent and Trademark Office**

48.    In early 2011, MMI purportedly developed and began marketing a public safety background investigation management software under the trademark "eSOPH."

49.    On April 6, 2011, MMI filed a provisional patent application entitled "Background Investigation Web Services," U.S. Patent Application No. 61/472,556.

50.    Throughout 2011, MMI marketed the eSOPH software to public agencies, procuring its first contract with the King County (WA) Sheriff's Department in December 2011.

51.    On information and belief, based on publicly-available materials obtained through the Oklahoma Action and open records requests, while Defendants were engaged in marketing their product to the King County (WA) Sheriff's Department in 2011, Miller became aware of and/or obtained access to the public safety background investigation management software used by King

COMPLAINT                                                                                          1260427.3

County before its use of eSOPH—i.e., King County used Background Solutions, LLC's software marketed under the trademark "Background Assistant™."

52. Through awareness of and/or access to the software, Miller became aware of the various features and functionalities of the Background Assistant™ software, namely, Background Assistant's™ ability to auto-generate a list of and correspondence to law enforcement agencies based on the residential address of an applicant.

53. On April 6, 2012, Miller filed a non-provisional U.S. Patent Application No. 13/441,648, which was intended to convert the '556 Provisional Application into a Non-Provisional Utility Application for review by the USPTO. Following the filing of the '648 Application and before issuance, Defendants and their counsel had a continuing duty under 37 C.F.R. § 1.56 to disclose material, noncumulative prior art information of which they were aware to the USPTO for consideration in allowing the patent application.

54. The '648 Application was allowed by the USPTO on April 7, 2015. At all times after the allowance of the '648 Application and before issuance, Defendants and their counsel had a continuing duty under 37 C.F.R. § 1.56 to disclose material, noncumulative prior art information of which they were aware to the USPTO for consideration in issuing the patent application.

55. On June 30, 2015, the '648 Application was issued as the '098 Patent. Despite their duty under 37 C.F.R. § 1.56, at no time following the filing of the '648 Application did Defendants or their counsel disclose the existence and/or functionalities of the Background Assistant™ prior art software to the USPTO for consideration as to the appropriateness of issuing the '098 Patent.

56. On May 26, 2015, Miller filed a continuation, non-provisional U.S. Patent Application. No. 14/721,707, claiming priority to the '098 Patent. Following the filing of the '707 Application and prior to issuance, Defendants and their counsel had a continuing duty under 37 C.F.R. § 1.56 to disclose material, noncumulative prior art information they were aware of to the USPTO for consideration in allowing the patent application.

57. The '707 Application was allowed by the USPTO on June 22, 2018. At all times after the allowance of the '707 Application and before issuance, Defendants and their counsel had

/ / /

COMPLAINT                                                                                                    1260427.3

1   a continuing duty under 37 C.F.R. § 1.56 to disclose material, noncumulative prior art information

2   of which they were aware to the USPTO for consideration in issuing the patent application.

3       58.    On August 7, 2018, the '707 Application was issued as the '188 Patent. Despite

4   their duty under 37 C.F.R. § 1.56, at no time following the filing of the '707 Application did

5   Defendants or their counsel disclose the existence and/or functionalities of the Background

6   Assistant™ prior art software to the USPTO for consideration as to the appropriateness of issuing

7   the '188 Patent.

8       59.    The '098 and '188 Patents are unenforceable because inventor Miller, assignee

9   MMI, and their patent attorneys, Philip Hunt of Rylander & Associates, PC, failed to disclose all

10  noncumulative material prior art of which they were aware to the U.S. Patent and Trademark Office

11  during prosecution of the '098 and '188 Patents.

12      60.    Specifically, *at no time* during the prosecution of the '098 and '188 Patents did

13  Miller or his counsel file an information disclosure statement with the USPTO (despite their

14  continuing duty of disclosure under 37 C.F.R. § 1.56 to do so), let alone particularly disclose the

15  existence and capabilities of the Background Assistant™ prior art software.

16      61.    Miller, MMI, and Mr. Hunt violated their continuing duty of disclosure under 37

17  C.F.R. § 1.56 when they failed to disclose the existence and capabilities of the Background

18  Assistant™ prior art software during the prosecution of the '098 and '188 Patents.

19      62.    On information and belief, and indeed, before August 7, 2018 (when the '188 Patent

20  was issued) and perhaps even before the '648 Application was filed on April 6, 2012), Miller was

21  aware of the Background Assistant™ prior art software and its functions and capabilities.

22      63.    The Background Assistant™ prior art software, which was publicly available

23  before the earliest possible priority date of the '188 Patent and of which Miller and Hunt were aware

24  during prosecution of the '188 Patent, discloses automatically generating a list of law enforcement

25  agencies within a certain radius based on residential address information in the application. This

26  capability or functionality of the Background Assistant™ prior art software was publicly disclosed

27  in presentations as follows:

28  / / /

COMPLAINT                                                                          1260427.3



64.     On December 9, 2014, during the prosecution of the '098 Patent, Messrs. Miller and Hunt further amended claims 1, 5, and 9 of the pending '649 Application (which was issued as the '098 Patent) to include the limitation "generating a suggested reference list of one or more law enforcement agencies and/or courts within a pre-defined radius around the applicant residential address; and presenting the suggested reference list to the investigator." December 9, 2014 Amendment and Response to Office Action in '098 Prosecution, a true and correct copy of which is attached hereto as Exhibit 3.

65.     Messrs. Miller and Hunt argued in favor of allowing the claims in the '648 Application, stating that "Parikh teaches e-dossiers that may have candidate referral information, but Parikh is silent on how information is obtained and entered into the e-dossier." *Id.*

66.     Messrs. Miller and Hunt made these representations to the USPTO despite Miller's knowledge of the existence and capabilities of the Background Assistant™ prior art software at least as early as August 9, 2012. Further, Messrs. Miller and Hunt made these representations to the

14

1  USPTO despite Miller's knowledge that the Background Assistant™ prior art software had been

2  used by the King County (WA) Sheriff's Department for several years. *See* August 9, 2012, email

3  thread between Miller and Detective Robert Burrows of the King County (WA) Sheriff's Office

4  Background Investigation Unit, a true and correct copy of which is attached hereto as Exhibit 4.

5          67.     Additionally, Miller was aware no later than February 28, 2014, of the existence of

6  and features of the Background Assistant™ prior art software, specifically that the Background

7  Assistant™ prior art software compiled a list of law enforcement agencies and auto-generated

8  correspondence letters in the background investigation process based on the residential address of

9  the applicant. Miller's awareness of these features of the Background Assistant™ came no later than

10  approximately nine months before Miller amended the independent claims of the '098 Patent to

11  include the element of "generating a suggested reference list of one or more law enforcement

12  agencies and/or courts within a pre-defined radius around the applicant residential address; and

13  presenting the suggested reference list to the investigator." *See* February 28, 2014, email thread

14  between Miller; Alexandra Ehlert, Human Resources Associate for the King County (WA) Sheriff's

15  Office; and Mark Sawa of the Travis County (TX) Sheriff's Department, a true and correct copy of

16  which is attached hereto as Exhibit 5.

17          68.     Similarly, during the prosecution of the '707 Application (that was issued as the

18  '188 Patent), Miller and his patent attorney Philip Hunt amended claims 1, 5, and 9 to add the

19  limitation, "generating a suggested reference list of one or more law enforcement agencies based

20  on the applicant's residential address," despite being aware for more than 3.5 years that the

21  Background Assistant™ prior art software compiled a list of law enforcement agencies and auto-

22  generated correspondence letters in the background investigation process based on the residential

23  address of the applicant. *See* October 23, 2017 Amendment and Response to Office Action, a true

24  and correct copy of which is attached hereto as Exhibit 6.

25          69.     Miller and Mr. Hunt argued in the October 23, 2017, Amendment and Response to

26  Office Action that the limitation they added—

27                  [I]s a slightly broader version of a limitation in claims 1, 5 and 9 of
                the parent application, now issued as US9070098. Claims 1, 5 and

28                  9 of the instant application after this amendment are now very

                                                  1260427.3

> similar to claims 1, 5 and 9 of the '098 patent. The same reasoning the Applicant advanced in the prosecution of the '098 patent applies here as well. Parikh teaches e-dossiers that may have candidate referral information, but Parikh is silent on how information is obtained and entered into the e-dossier. The other art of record does not supply this deficiency of Parikh. For at least these reasons, the Applicant believes these claims are patentable.

*Id.*

70. On December 26, 2017, the USPTO issued an office action, during the prosecution of the '707 Application, rejecting Claims 1–3, 5–7, 9, 13–14, and 16 of the '188 Patent under pre-AIA 35 U.S.C. § 103(a), in part because:

> Duffy teaches generating a suggested reference list of one of more law enforcement agencies based on an applicant residential address (¶0105; note that Duffy is not directed to law agencies. However, this is (*sic*) would be obvious to use generating a list to one of ordinary skill in the art with the above references that deals with law enforcement).

*See* December 26, 2017 Office Action, a true and correct copy of which is attached hereto as Exhibit 7.

71. In response to the USPTO's December 26, 2017, rejection of the claims of the '707 Application under pre-AIA 35 U.S.C. § 103(a), Miller and Mr. Hunt argued:

> Regarding rejection of claim 1 as obvious, OA pages 16-17 states "Duffy teaches generating a suggested reference list of one of more law enforcement agencies based on an applicant residential address." Examiner acknowledges that Duffy is "not directed at law enforcement agencies. Applicant points out that Duffy is not only not directed at employment background checks for law enforcement agencies. It is also not directed at any type of background investigations for any type of employer. It is directed at product recalls, a completely unrelated field and one that is not reasonably pertinent to the field of background investigations.

*See* March 7, 2018 Applicant Initiated Interview Summary, a true and correct copy of which is attached hereto as Exhibit 8.

72. On June 22, 2018, in response to the remarks made by Miller and Mr. Hunt, the USPTO issued a Notice of Allowance for the '707 Application, stating as the reason for allowance that the—

/ / /

COMPLAINT

1260427.3

Prior art does not teach " ... investigator ... associating the reference electronic response with the new application entry and ... generating a suggested reference list of one more law enforcement agencies based on an applicant residential address" of Claim 1. Note that Claims 5, 9 and 16 are substantially similar to Claim 1, thus the same rationale applies with respect to prior art and allowance.

The closest prior art are Parikh et al. US 2012/0089528A1, LaPasta et al. US 2005/0033633A1, Ritzel US 6904407 B2 and Duffy et al. US 2009/0319331 A 1.

However, prior art still fail (*sic*) to teach " ... investigator ... associating the reference electronic response with the new application entry and ... generating a suggested reference list of one more law enforcement agencies based on an applicant residential address" of Claim 1. Note that Claims 5, 9 and 16 are substantially similar to Claim 1, thus the same rationale applies with respect to prior art and allowance.

In addition, Applicant's arguments filed 4/26/2018 have been considered and found persuasive.

*See* June 22, 2018 Notice of Allowance, a true and correct copy of which is attached hereto as Exhibit 9.

73.    The Background Assistant™ prior art software is therefore material to the patentability of the '098 and '188 Patents, particularly as to the limitation of "generating a suggested reference list of one or more law enforcement agencies based on the applicant residential address." The patent examiner would not have allowed the claims of the '098 and '188 Patents to issue in their present form had Miller and/or Mr. Hunt disclosed the Background Assistant™ prior art software to the USPTO, as they were required to do under 37 C.F.R. § 1.56. In particular, the USPTO would not have issued the claims of the '098 and '188 Patent in their present form if the Background Assistant™ prior art software had been disclosed, as it provides the teaching that the examiner believed was absent from the prior art known to and relied upon by the examiner. Despite knowing differently, Messrs. Miller and Hunt affirmatively stated that the prior art did not contain any reference to a step of "generating a suggested reference list of one or more law enforcement agencies based on the applicant residential address." The Background Assistant™ prior art software clearly and unambiguously disclosed the step of "generating a suggested reference list of one or more law enforcement agencies based on the applicant residential address."

17

74.     Thus, "but for" Messrs. Miller and Hunt violating their duty of candor and good faith in dealing with the USPTO by failing to disclose the existence and capabilities of the Background Assistant™ prior art software, the '098 and '188 Patents would not have been allowed by the examiner and issued by the USPTO.

75.     Based on Miller's prior awareness of the Background Assistant™ prior art software, and particularly his familiarity with its capabilities and features, on information and belief, the failure of inventor Miller and his patent attorney Philip Hunt, to disclose the Background Assistant™ prior art software to the USPTO was done with intent to deceive the examiner into allowing the '098 and '188 Patents eventually issued by the USPTO.

76.     The Background Assistant™ prior art software that Miller and his patent attorneys withheld from the USPTO during the prosecution of the '098 and '188 Patents was material because every claim required the step of "generating a suggested reference list of one or more law enforcement agencies based on the applicant residential address." None of these claims would have been allowed or eventually issued had the examiner and/or the USPTO been aware of the Background Assistant™ prior art software.

77.     Through his agents and patent attorneys, Miller made the deliberate decision not to disclose the Background Assistant™ prior art software to the examiner and the USPTO because such disclosure would have rendered all of the claims of the '098 and '188 Patents unpatentable. I.e., the examiner would not have allowed any of the claims of the '098 and '188 Patents if they had been aware of the Background Assistant™ prior art software.

78.     In light of the preceding, the decision of Miller and his prosecution counsel to withhold evidence of Background Assistant™ prior art software during Miller's prosecution of the '098 and '188 Patents constitutes a failure of Miller and his counsel's duty of candor under 37 C.F.R. § 1.56. As such, Miller, MMI as assignee, and their patent counsel committed fraud on the USPTO, rendering the claims of the '098 and '188 Patents unenforceable.

/ / /

/ / /

/ / /

COMPLAINT                                                                                      1260427.3

**D.** **The Patent-Ineligible Subject Matter of the MMI Patent Portfolio Under 35 U.S.C. § 101**

79.     The '098 and '188 Patents, entitled "Background Investigation Management Service," were issued on June 30, 2015, and August 7, 2018, respectively.

80.     The specifications of the '098 and '188 Patents are identical, explaining that their "subject matter relates to a system to facilitate the process of performing background applications on a plurality of applicants."

81.     In the "Background Information" section of the '098 and '188 Patents, the specification notes that:

> In many areas, but particularly in the area of law-enforcement pre-employment background investigations, investigators report they spend, on average, 40 hours per applicant investigation. During this process, the applicant typically completes *a paper packet* comprised of questions pertaining to the applicant's life history, including information on criminal activity, financial history, drug history, listing relatives and personal references, employment history, and many other in-depth personal questions … The investigator typically uses resources available to him or her to confirm the information the applicant provided in the various documents, to include, contacting past employers, supervisors, neighbors, relatives, references, landlords, etc., which makes up the bulk of the investigator's 40 hours per applicant of spent time.
>
> What has eluded the industry is an ***automated*** system to help a background investigator ***more efficiently and effectively*** conduct a background investigation.

(Emphasis added).

82.     Describing the embodiment represented in FIG. 1 of the '098 and '188 Patents, the specification states that:

> … software system **100** allows an organization **102** the ability to create and customize electronic documents **104** to be sent to applicants to complete via the software system **100**, and returned to the software system **100** in similar fashion. The software system 100 includes a document creation component **114** and a document management component **116**. The system **100** ***automates the majority of the tasks of a common pre-employment background investigation*** so that fewer hardcopy documents are necessary, thus creating more efficient management of individual background investigations.

(Emphasis added)

19



Fig. 1

83.    Representative claim 1 of the '098 Patent and representative claim 1 of the '188 Patent state:

Claim 1 of the '098 Patent:

1.    A method for a computing device with a processor and a system memory to assist an investigator in conducting a background investigation of an applicant for a position within a first organization, comprising the steps of:

receiving program data identifying the applicant, the position, the first organization, and the investigator;

storing a new applicant entry in the system memory, the new applicant entry associated with the program data identifying the applicant, the position, the first organization, and the investigator;

transmitting an applicant hyperlink to an applicant email address associated with the applicant, the applicant hyperlink for viewing an applicant set of electronic documents;

receiving an applicant electronic response with program data regarding a first reference, wherein the first reference is a first

20

person likely to have information regarding the applicant, the program data including a first reference email address associated with the first reference;

determining a reference class of the first reference based on the program data regarding the first reference;

selecting a first reference set of electronic documents based on the reference class of the first reference; transmitting a first reference hyperlink to the first reference email address, the first reference hyperlink for viewing the first reference set of electronic documents associated with the position;

receiving a first reference electronic response to the first reference set of electronic documents from the first reference;

storing the first reference electronic response in the system memory, associating the first reference electronic response with the new applicant entry; and

obtaining an applicant residential address from the applicant electronic response;

generating a suggested reference list of one or more law enforcement agencies and/or courts within a pre-defined radius around the applicant residential address; and

presenting the suggested reference list to the investigator.

Claim 1 of the '188 Patent:

1.     A method for a computing device with a processor and a system memory to assist an investigator in conducting a background investigation of an applicant for a position within a first organization, comprising the steps of:

receiving a first set of program data comprising information identifying the applicant, the position, the first organization, and the investigator;

storing a new applicant entry in the system memory, the new applicant entry associated with the first set of program data;

transmitting an applicant hyperlink to an applicant email address associated with the applicant, the applicant hyperlink for viewing an applicant set of electronic documents;

receiving an applicant electronic response with a reference set of program data, wherein the reference set of program data comprises information regarding a reference source, wherein the reference source is a person, the program data including a reference email address associated with the reference source;

21

COMPLAINT

1260427.3

determining a reference class of the reference source based on the reference set of program data;

selecting a reference set of electronic documents based on the reference class of the reference source;

transmitting a reference hyperlink to the reference email address, the reference hyperlink for viewing the reference set of electronic documents;

receiving a reference electronic response to the reference set of electronic documents from the reference source;

storing the reference electronic response in the system memory, associating the reference electronic response with the new applicant entry; and

generating a suggested reference list of one or more law enforcement agencies based on an applicant residential address.

84.     During the prosecution of the '098 and '188 Patents, the examiner rejected the proposed claims of both patents as comprising unpatentable subject matter under 35 U.S.C. § 101. [*See,* e.g., 3/10/2014 USPTO communication to Miller during prosecution of the '098 Patent and Proposed Agenda from 3/7/2018 Interview Summary during prosecution of the '188 Patent, true and correct copies of which are attached hereto as Exhibits 10 and 11, respectively].

85.     In the prosecution of the '098 Patent, after Miller amended the claims rejected under § 101 to include the phrase "non-transitory computer readable medium," the examiner withdrew the § 101 rejection.

86.     In the prosecution of the '188 Patent, after noting that the patent examiner found that the proposed claims fall under the abstract concept of "Fundamental Economic Practices," Miller's patent lawyer responded to the § 101 rejection by stating that the proposed claims were "significantly more" than an abstract concept. [4/26/2018 Communication, Prosecution History of the '188 Patent, pp. 10–12 attached hereto as Exhibit 12]

87.     Miller's patent attorney further argued that the patent examiner had wrongly found the claims to be an abstract concept because the examiner had failed to expressly support the necessary underlying factual determinations to reach such a conclusion, as required by Patent Office guidelines then in effect for a § 101 rejection, which required: "(1) a citation to an express statement by applicant; (2) a court decision finding similar claim language ineligible; (3) a publication that

demonstrates the well-understood, routine, conventional nature of the additional element(s); or (4) a "statement that the examiner is taking official notice of the well-understood, routine, conventional nature of the additional element(s)." [*Id.* at p. 11].

88.    In particular, Miller's patent lawyer asserted that to the best of Miller's knowledge, the examiner had not and "will not be able to supply one of the four items above for specifically one element of claim 1: 'generating a suggested reference list of one or more law enforcement agencies based on an applicant residential address.'" [*Id.*]

89.    In response to Miller's argument, the patent examiner tacitly withdrew the § 101 statutory subject matter rejection and allowed the claims. [6/22/2018 Notice of Allowability, Prosecution History of the '188 Patent, pp. 1-4, a true and correct copy of which is attached hereto as Exhibit 13].

90.    Contrary to Miller's arguments throughout the prosecution of the MMI Patent Portfolio, the claims of the '098 and '188 Patents, as well as the pending claims in the '622 Application and the '686 Application, are all directed to non-statutory subject matter under 35 U.S.C. § 101.

91.    Concerning the '188 Patent, Judge Gilstrap in the U.S. District Court for the Eastern District of Texas recently held the asserted claims invalid under 35 U.S.C. § 101, stating:

> [T]he Court finds that the '188 Patent and its claims do not purport to solve any technical problem associated with prior art products or methods. Instead, the '188 Patent provides a "system for managing the process of performing pre-employment background investigations" to "save organizations time and other costly resources." ('188 Patent at 3:67–4:40.) Put another way, the "subject matter turns much of a common pre-employment background investigation electronic, so that fewer hardcopy documents are necessary, thus creating more efficient management of individual background investigations." *(Id.* at Abstract.) The Court finds such to be an abstract idea directed toward automation of basic information gathering and organization.
>
> ***
>
> The Court is not persuaded by Miller Mendel's argument that the concept of "generating a suggested reference list of one or more law enforcement agencies based on an applicant residential address" is an "additional element" that renders the claims of the '188 Patent non-abstract … Although the '188 Patent mentions, inter alia, computers, servers, mobile phones, and personal headset devices,

1

2

the claims and specification lack any disclosure or limitation that indicates a technical improvement of any such components.

\*\*\*

3

4

5

Miller Mendel's focus on novelty and non-obviousness is misplaced. As noted earlier, Miller Mendel once again conflates the analysis of whether the '188 Patent is directed to eligible subject matter under § 101 with whether it meets §§ 102 and 103's novelty requirements.

6

\*\*\*

7

8

9

10

Miller Mendel's purported improvement over the prior art is "the alleged efficiency of the method through computerization," which is not enough to confer patent eligibility … The computer and internet technologies described in the '188 Patent are generic, and requiring the use of generic computer technology does not create an inventive concept.

\*\*\*

11

12

13

14

The '188 Patent claims the well-known process of performing a background check. While the patent inarguably "turns much of a common pre-employment background investigation electronic," such is not enough to make the abstract idea patent eligible. At the end of the day, it remains a "common pre-employment background investigation," which is not eligible for patent protection.

15

16

*See* Judge Gilstrap's April 14, 2014 Order in the Texas Action, at pp. 12–13 and 17–20, a true and correct copy of which is attached hereto as Exhibit 14.

17

18

19

92.     After MMI requested Judge Gilstrap to reconsider his Order, on June 9, 2022, Judge Gilstrap confirmed his prior Order finding the asserted claims of the '188 Patent invalid under 35 U.S.C. § 101, stating:

20

21

22

23

24

Importantly, Miller Mendel failed to cite or discuss in this Motion the standard for reconsideration or perform any analysis of the 12(c) Order under the factors relevant to a Rule 59(e) motion … Instead, Miller Mendel repackages its previously presented arguments in an effort to show that the 12(c) Order was not based in fact. Miller Mendel certainly has not presented any new evidence or intervening change in case law that casts doubt on the Court's decision to grant the 12(c) Motion, nor has Miller Mendel identified any error or injustice in the 12(c) Order.

25

\*\*\*

26

27

28

As the Court stated in the 12(c) Order, the '188 Patent itself describes a "system for managing the process of performing pre-employment background investigations" to "save organizations time and other costly resources." (Dkt. No. 41 at 12 (citing '188 Patent at 3:67–4:40).) The '188 Patent explicitly states that the "subject matter turns much of a common pre-employment background

24

1

> investigation electronic, so that fewer hardcopy documents are necessary, thus creating more efficient management of individual background investigations." ('188 Patent at Abstract.)

2

3

> ***

4

> The Court did not rely on evidence outside of the '188 Patent to find that it was directed to an abstract idea because the language intrinsic to the '188 Patent itself demands such a conclusion. As the Federal Circuit has recently held, "the automation of [a] conventional human process to make it more efficient is itself an abstract idea."

5

6

7

> ***

8

> Miller Mendel's Motion further compels the conclusion that the claimed process can be done with pen, paper, and the human mind, and even explicitly outlines how a background investigator would have performed such a process based on the language in the '188 Patent. (*See, e.g.*, Dkt. No. 47 at 11 (stating that the process can be performed by "purchasing maps for every city and state in the country and forcing a human background investigator to spend tens if not hundreds of hours poring over such maps with a magnifying glass in the forlorn hope of accurately

9

10

11

12

13

> locating all the relevant law enforcement agencies.").) Indeed, the details presented by Miller Mendel regarding how a background investigator would practice the claims without the aid of even a generic computer prove the Court's conclusion from the 12(c) Order and demonstrate that, while a "pen and paper version of the claimed method would not be particularly efficient, [] it could be completed."

14

15

16

17    *See* Judge Gilstrap's June 9, 2022 Order on MMI's Motion for Reconsideration, at. pp. 9–11, a true

18    and correct copy of which is attached hereto as Exhibit 15.

19          93.    Concerning the '686 Application, on June 22, 2022, the USPTO rejected all

20    pending claims of that application under, *inter alia*, 35 U.S.C. § 101, citing Judge Gilstrap's Order

21    invalidating claims 1, 5, and 15 of the '188 Patent. It must be noted that there is no record of

22    Defendants bringing Judge Gilstrap's Order to the examiner's attention (despite the ethical

23    obligation to do so under 37 C.F.R. § 1.56). Instead, the examiner became aware of Judge Gilstrap's

24    Order on their own. A true and correct copy of the USPTO's June 22, 2022 Office Action is attached

25    hereto as Exhibit 16.

26          94.    Concerning the '622 Application, on July 14, 2022, the Patent Trial and Appeal

27    Board finally rejected all claims of that application under, *inter alia*, 35 U.S.C. § 101. A true and

28    / / /

1260427.3

correct copy of the Patent Trial and Appeal Board's July 14, 2022 Decision on Appeal is attached hereto as Exhibit 17.

E.    **Defendants' Patent Infringement Suits and Other Unlawful Attempts to Enforce the MMI Patent Portfolio Against Guardian Customers**

95.    Defendants first accused Guardian of patent infringement in October 2017, asserting that Guardian's public safety background investigation management software (the "Guardian Platform") infringed the '098 Patent. A true and correct copy of the Defendants' October 10, 2017, letter to Guardian is attached hereto as Exhibit 18.

96.    As a result of the Defendants' threats, Guardian retained intellectual property counsel to render an opinion as to the validity of the '098 Patent. A true and correct copy of that opinion and its appendices are attached collectively hereto as Exhibit 19.

97.    On March 23, 2018, Guardian's counsel sent Defendants' counsel a response communication, stating, amongst other things, that:

> With respect to the 098 patent, patent law subject matter decisions after the U. S. Supreme Court ruling in Alice Corp. Pty. Ltd. v. CLS Bank International, 134 S. Ct. 2347, at 2354 (2014) as to the patentability of business methods and certain software based products invoke a more rigorous standard than was applied to the 098 patent by the U. S. Patent Office during its examination. In fact, those standards are currently part of the Patent Office's Manual of Patent Examining Procedures ("MPEP") 2106. Under the Alice ruling, a full slate of U. S. District Court and Federal Circuit cases following Alice, and/or MPEP 2106, the validity of all claims of the 098 patent are suspect under 35 U.S.C.§101. Please consider this as Guardian's response to the Rylander letter.

A true and correct copy of the March 23, 2018, letter to the Defendants' counsel is attached hereto as Exhibit 20. As such, as early as March 23, 2018, Defendants and their counsel were expressly aware of and were on notice that the claims of the '098 Patent were susceptible to challenge as being directed to non-statutory subject matter under 35 U.S.C. § 101.

98.    Defendant's counsel responded in writing on March 30, 2018, a true and correct copy of which is attached hereto as Exhibit 21    .

99.    Approximately six months later, on October 9, 2018, Defendants sued the City of Oklahoma City, Case No. 5:18-cv-00990-JD, in the United States District Court for the Western

26

District of Oklahoma (the "Oklahoma Action"), for patent infringement based on the City of Oklahoma City's use of the Guardian Platform. Guardian was contractually obligated to defend and indemnify the City of Oklahoma City against MMI's patent infringement claims and has funded the entirety of the defense in the Oklahoma Action, which remains pending.

100.    Approximately one year into the Oklahoma Action, Defendants attempted to sue Guardian for patent infringement in the Western District of Oklahoma. Still, the Oklahoma Court disallowed the claim as Guardian is neither incorporated in Oklahoma nor does it maintain a regular and established place of business there, as required by 28 U.S.C. § 1400(b) following the Supreme Court's decision in *TC Heartland LLC v. Kraft Foods Group Brands LLC*, 581 U.S. ____, 137 S.Ct. 1514, 197 L.Ed.2d 816 (2017). As such, the Oklahoma Court was not the proper venue to bring suit against Guardian for patent infringement.

101.    On February 1, 2021, MMI sued Washington County, Oregon, and Washington County (OR) Sheriff's Office, Case No. 3:21-cv-00168-SB, in the United States District Court for the District of Oregon (the "Oregon Action"), for patent infringement based on the Sheriff's Office's use of the Guardian Platform. As in the Oklahoma Action, Guardian was contractually obligated to defend and indemnify Washington County, Oregon, against MMI's claims of patent infringement and has funded the entirety of the defense in the Oregon Action, which remains pending. On April 2, 2021, the Oregon Court, upon a contested motion by Guardian, through its indemnitees Washington County and the Sheriff's Office, stayed the proceedings in the Oregon Action pending the outcome in the Oklahoma Action.

102.    On May 28, 2021, Defendants sued the Alaska State Troopers and James E. Cockrell, Commissioner of the State of Alaska Department of Public Safety, Case No. 3:21-cv-00129-HRH, in the United States District Court for the District of Alaska (the "Alaska Action"), for patent infringement based on the Alaska State Troopers' use of the Guardian Platform. As in the Oklahoma and Oregon Action, Guardian was contractually obligated to defend and indemnify the Alaska State Troopers against MMI's patent infringement claims and has funded the entirety of the defense in the Alaska Action, which remains pending. On August 19, 2021, the Alaska Court, upon

/ / /

27

1    a contested motion by Guardian, through its indemnitee, the Alaska State Troopers, stayed the

2    proceedings in the Alaska Action pending the outcome in the Oklahoma Action.

3           103.    On December 2, 2021, MMI sued the City of Anna, Texas, and the Anna (TX)

4    Police Department, Case No. 2:21-cv-00445-JRG, in the United States District Court for the Eastern

5    District of Texas (the "Texas Action"), for patent infringement based on the Anna Police

6    Department's use of the Guardian Platform. As in the Oklahoma, Oregon, and Alaska Actions,

7    Guardian was contractually obligated to defend and indemnify the City of Anna, Texas, against

8    MMI's patent infringement claims and has funded the entirety of the defense in the Texas Action.

9           104.    In place of seeking to stay the Texas Action, Guardian, through its indemnitee City

10   of Anna, Texas, shortly after answering the complaint, moved for judgment on the pleadings that

11   the '188 Patent was invalid under 35 U.S.C. § 101. The district court granted the motion, denied

12   MMI's motion for reconsideration, and clarified that its order invalidating the claims under 35

13   U.S.C. § 101 "pertained only to claims 1, 5, and 15" of the '188 Patent because "[t]he Court did not

14   analyze any other claim because the Court did not understand any other claim was asserted."

15          105.    In addition to the four lawsuits, MMI and/or Miller have filed against Guardian

16   customers, Defendants have threatened scores of Guardian's actual and prospective customers with

17   litigation, warning them that they will be sued for their actual or potential use of the Guardian

18   Platform. Miller and/or MMI's threats have resulted in millions of dollars of lost revenue to

19   Guardian.

20          106.    Since Defendants sued The City of Oklahoma City, Oklahoma, in October 2018

21   for alleged patent infringement based on its use of the Guardian Platform, Guardian is aware of

22   over ninety (90) agencies that Defendants have sued or threatened to sue for patent infringement

23   for their use or potential use of the Guardian platform.

24          107.    Guardian is also aware of seventeen (17) agencies that ceased using the Guardian

25   Platform, decided not to use the Guardian Platform, and/or elected to use the Miller Mendel eSOPH

26   public safety background investigation management software because of Defendants' threats of

27   protracted and expensive patent infringement litigation. The known agencies fitting this description

28   include:

COMPLAINT                                                                                    1260427.3

- Anoka, Minnesota;
- Bothell, Washington Police Department;
- Bozeman, Montana Police Department;
- Broken Arrow, Oklahoma Police Department;
- Buckeye, Arizona;
- CA Dept of Corrections;
- Fort Worth, Texas Police Department;
- Fresno, California Police Department;
- Gilbert, Arizona Police Department;
- Hennepin County, Minnesota Sheriff's Office;
- Kern County, California Sheriff's Office;
- Maricopa County, Arizona Sheriff's Office;
- Minnesota State Highway Patrol;
- New Orleans, Louisiana Police Department;
- Orange County, California District Attorney's Office;
- Salem, Oregon Police Department; and
- University of Missouri Police Department.

108.    As a direct result of Defendants' threats, Guardian conservatively estimates it has lost more than seven figures in recurring annual revenues due to MMI's threats to sue users or potential users of the Guardian Platform.

109.    Despite the significant growth of Guardian's customer base from its first contact with Defendants' counsel, Guardian has been unable to publicize its growth publicly or adequately acknowledge the existence of its customers because of Guardian's fear of Defendants' potential interference with Guardian's contractual relationships. Defendants' threats and interfering actions continue to stifle Guardian's ability to grow its base of customers using the Guardian Platform. The Defendants' actual and prospective threats to and interference with Guardian's customers have artificially stifled Guardian's growth, thereby chilling competition in the Market.

/ / /

COMPLAINT                                                                                          1260427.3

110.   In a February 24, 2020 communication to Guardian, a true and correct copy of which is attached hereto as Exhibit 22, the City of Gilbert, Arizona advised it was "notified in writing by Mr. Tyler Miller with Miller Mendel, Inc. about a pending patent infringement case in Federal Court in Federal Court against Guardian Alliance Technologies," and that "Gilbert does not want to be involved in this litigation." The City of Gilbert subsequently suspended its use of the Guardian Platform.

111.   In a March 27, 2020 communication to Guardian, a true and correct of which is attached hereto as Exhibit 23, the Story County, Iowa Sheriff's Office forwarded a message from Defendants, in which Miller threatens, "[s]hould the County fail to cease using [Guardian's] infringing service/product, further legal correspondence will have to be forthcoming."

112.   In an August 16, 2021 communication, a true and correct copy of which is attached hereto as Exhibit 24, the City of Fresno, California Police Department notified Guardian that it was "terminating its contract with [Guardian] due to the pending litigation involving [Guardian], Miller Mendel, Inc., and law enforcement agencies utilizing [Guardian] software."

113.   In an October 13, 2021 communication, a true and correct copy of which is attached hereto as Exhibit 25, the City of Fort Worth, Texas advised Guardian that, because of Defendant MMI's threat that "it intended to sue the City [of Fort Worth] if [it] did not immediately halt all use of the [Guardian] software," the City of Fort Worth "is officially suspending its right to purchase goods or services through the Contract [with Guardian] immediately, pending resolution of the patent litigation in Oklahoma Federal Court."

114.   In a January 24, 2022 communication to the Cedar Rapids, Iowa Police Department, which was subsequently forwarded to Guardian, a true and correct copy of which is attached hereto as Exhibit 26, Defendants warned they "will continue to file claims against those who use the [Guardian] software."

115.   It's not just that Defendants continue to threaten users of the Guardian Platform aggressively; instead, Defendants have repeatedly made false and misleading statements about the MMI Patent Portfolio as well as the course and outcome of Defendants' lawsuits against users of the Guardian Platform. Defendants' false and misleading statements have significantly affected

1   actual and potential users of the Guardian Platform—an inherently risk-averse type of Market

2   participant.

3       116.    In a March 26, 2020 communication to Guardian customer the State of Alaska, a

4   true and correct copy of which is attached hereto as Exhibit 27, Defendants intentionally misstated

5   the result, scope, and effect of a decision by the Patent Trial and Appeal Board ("PTAB") in a

6   collateral *inter partes* review ("IPR") proceeding. Defendants misstated that the PTAB's decision

7   "illustrates Guardian Alliance Technologies' Infringement and failed attempt to cover his [sic]patent

8   infringement/theft." As Guardian's counsel promptly pointed out to counsel-of-record for

9   Defendants, this statement is false as the Patent Trial and Appeal Board ***does not have*** jurisdiction

10  to determine liability for infringement of a patent.

11      117.    Despite Guardian's requests to Defendants' counsel to cure these false statements

12  in the marketplace, Defendants ramped up their unfair and anti-competitive actions in the Market.

13  For example, Defendants began publishing and circulating a so-called "memo" in the Market about

14  Guardian and the Guardian Platform. This "memo" contained a "large number of literal falsehoods,

15  egregious misrepresentations and inaccuracies, and selective withholding of material information,"

16  as Guardian's counsel once again pointed out to Defendants' counsel. A true and correct copy of the

17  "memo," as contained in a July 25, 2021 email from Miller to the City of Buckeye, Arizona and

18  subsequently provided to Guardian's counsel, is attached hereto as Exhibit 28.

19      118.    Again, Defendants did not heed Guardian's demands to cease their unfair and anti-

20  competitive behavior; instead, amplifying their efforts by subsequently making the "memo"

21  available to the general public through an October 1, 2021 "open letter" on Defendants' website at

22  https://www.millermendel.com/news/serious-public-concerns-miller-mendels-president-ceos-

23  public-letter-regarding-guardian-background-software/, a true and correct copy of which is attached

24  hereto as Exhibit 29. As of the date of the commencement of this suit, the "memo" and "open letter"

25  are still available at that location.

26      119.    In the "open letter," a true and correct copy of which is attached hereto as Exhibit

27  30, Defendants explain their deliberate decision to target Guardian's vulnerable public safety

28  customers instead of filing suit directly against Guardian:

31

1
2
3
4

> MMI has been asked why it has filed lawsuits against agencies using the Guardian software. The answer is this: the actual use of the Guardian software by the agency is the damaging aspect to MMI. If Guardian made the software but no agency "bought" the software to use, monetary damage would be little. The agency paying Guardian to use the infringing software is where the damage begins and continues.

5

> ***

6
7
8
9

> Regardless of whether Guardian indemnifies your agency and employees for your use of the Guardian software, **your agency and employees will have to navigate** the complicated process of defending yourselves in a patent infringement lawsuit, which includes producing labor-intensive discovery and (potentially) appearing for depositions.

10   (Emphasis added.) In addition to its misleading, at best, statements of law and fact in this "open

11   letter," Defendants took the liberty of outlining exactly how demanding and taxing the use of the

12   Guardian Platform would be for any public safety agency. The contours of Defendants' unfair,

13   anti-competitive, and monopolistic scheme are quite apparent from this "open letter."

14          120.    Even after Judge Gilstrap, Chief Judge of the Eastern District of Texas invalidated

15   Claims 1, 5, and 15 of the '188 Patent (i.e., the claims that Defendants have accused Guardian's

16   customers of infringing in the Oklahoma, Oregon, Alaska, and Texas Actions), Defendants'

17   attempts to intimidate actual and potential users of the Guardian Platform remain brazen. Guardian

18   continues to threaten the Market, issuing threats of patent infringement and claiming that

19   Defendants' patent remains in "full force and effect." This facially false and misleading, at best,

20   statement was included in a press release dated May 3, 2022, a true and correct copy of which is

21   attached hereto as Exhibit 31 and still available on Defendants' website as of the commencement of

22   this    suit    (https://www.millermendel.com/news/miller-mendels-esoph-patent-remains-in-full-

23   effect-after-judges-decision/).    The statements made in this press release have also been

24   communicated directly to at least some number of users of the Guardian Platform. For example, a

25   true and correct copy of Defendants' May 17, 2022 communication to Guardian customer Siskiyou

26   County (CA) Sheriff's Department attaching the "memo" and "open letter," subsequently provided

27   to Guardian's counsel is attached hereto as Exhibit 32.

28   ///

COMPLAINT                                                                                         1260427.3

121.    Even on the eve of the commencement of this suit, Defendants continue to directly contact users of the Guardian Platform, once again alerting them that Defendants have sued users of the Guardian Platform for patent infringement, asserting that *all claims* of the MMI Patent Portfolio are in full force and effect despite the Eastern District of Texas's invalidation, and repeating the egregious allegations contained in the "memo."

122.    These are a few examples of Defendants' unfair, anti-competitive conduct as part of its overt attempts to stifle competition and monopolize the Market.

123.    Defendants' attempted enforcement of the fraudulently-obtained MMI Patent Portfolio against current and prospective users of the Guardian Platform, Defendants' spreading of false and misleading statements in the marketplace about certain aspects of the Guardian Platform, and Guardian's business practices (i.e., the allegations found in the "memo"), alone or in combination with Defendants' other unfair, anti-competitive, and monopolistic conduct, has significantly harmed Guardian and injured the Market.

124.    Defendants' unfair, anti-competitive, and monopolistic conduct has forced Guardian to expend significant amounts of time, money, and human resources to defend and indemnify its customers that Defendants have sued—including the time and expense incurred by Guardian to explain the falsity of Defendants' statements and actions, and to mitigate the risk of Defendants' potential to bring suit against current and prospective users of the Guardian Platform.

125.    Defendants' unfair, anti-competitive, and monopolistic conduct has stifled Guardian's commercial growth and, therefore, competition in the Market due to Guardian's and current and prospective users of the Guardian Platform's fears of having to defend against baseless patent infringement lawsuits. As exemplified above, public safety agencies have ceased use of or refrained from using the Guardian Platform altogether amid Defendants' threats.

126.    Guardian and the Market have been harmed by Defendants' procurement of "sole-source" qualification (erroneously awarded based on the fraudulently-obtained MMI Patent Portfolio), thereby allowing Defendants to avoid open and competitive RFP processes for the sale of its public safety background investigation management software, eSOPH. Defendants' sole-source qualification has prevented Guardian, and other competitors of public safety background

COMPLAINT                                                                                    1260427.3

investigation management software, from bidding in RFP processes, thereby decreasing competition in the Market and maintaining monopoly-level pricing, harming the Market participants as a whole.

127.    With this suit, Guardian seeks redress and compensation for itself, and on behalf of the Market, for Defendants' unfair, anti-competitive, and monopolistic conduct. Grant of the relief sought herein by Guardian will return competition to the Market by reversing the chilling effect that Defendants' unfair, anti-competitive, monopolistic conduct has had on the Market.

## FIRST CLAIM FOR RELIEF

### Declaration of Unenforceability of the '098 Patent for

### Defendants' Inequitable Conduct

128.    Guardian incorporates and realleges paragraphs 1–127 herein by reference.

129.    Specifically, Guardian incorporates by reference the allegations set forth in paragraphs 33–78 above.

130.    An immediate, real, and justiciable controversy exists between Guardian and Defendants regarding the enforceability of the '098 Patent.

131.    Guardian seeks a judgment declaring that the claims of the '098 Patent are unenforceable under the doctrine of inequitable conduct.

## SECOND CLAIM FOR RELIEF

### Declaration of Unenforceability of the '188 Patent for

### Defendants' Inequitable Conduct

132.    Guardian incorporates and realleges paragraphs 1–131 herein by reference.

133.    Specifically, Guardian incorporates by reference the allegations set forth in paragraphs 33–78 above.

134.    An immediate, real, and justiciable controversy exists between Guardian and Defendants regarding the enforceability of the '188 Patent.

135.    Guardian seeks a judgment declaring that the claims of the '188 Patent are unenforceable under the doctrine of inequitable conduct.

/ / /

1260427.3

### THIRD CLAIM FOR RELIEF

#### Declaratory Judgment of Invalidity of the '098 Patent

#### Under 35 U.S.C. §§ 101, 102, 103, and 112

136.    Guardian incorporates and realleges paragraphs 1–135 herein by reference.

137.    Specifically, Guardian incorporates by reference the allegations set forth in paragraphs 33–94 above.

138.    All claims of the '098 Patent are invalid under *at least* 35 U.S.C. §§ 101, 102, 103, and 112.

139.    An immediate, real, and justiciable controversy exists between Guardian and Defendants regarding the validity of the '098 Patent.

140.    Guardian seeks a judgment declaring that the claims of the '098 Patent are invalid.

### FOURTH CLAIM FOR RELIEF

#### Declaratory Judgment of Invalidity of the '188 Patent

#### Under 35 U.S.C. §§ 101, 102, 103, and 112

141.    Guardian incorporates and realleges paragraphs 1–140 herein by reference.

142.    Specifically, Guardian incorporates by reference the allegations set forth in paragraphs 33–94 above.

143.    All claims of the '098 Patent are invalid under *at least* 35 U.S.C. §§ 101, 102, 103, and 112.

144.    An immediate, real, and justiciable controversy exists between Guardian and Defendants regarding the validity of the '188 Patent.

145.    Guardian seeks a judgment declaring that the claims of the '098 Patent are invalid.

### FIFTH CLAIM FOR RELIEF

#### *Walker Process:* Attempted Monopolization in

#### Violation of § 2 of the Sherman Act, 15 U.S.C. § 2

146.    Guardian incorporates and realleges paragraphs 1–145 herein by reference.

/ / /

/ / /

COMPLAINT

1260427.3

147.    Defendants have attempted to monopolize the Background Investigation Management Software Management Market, a nationwide market in which Defendants are actively engaged in interstate commerce.

148.    Defendants have attempted to monopolize the Market with the specific intent to do so through their fraudulent misrepresentations and omissions to the USPTO in connection with the prosecution of the MMI Patent Portfolio, creating a dangerous probability that Defendants will obtain a monopoly in the Market in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

149.    The MMI Patent Portfolio that Defendants asserted and threatened to assert against Guardian and its customers was invalid and unenforceable due to inequitable conduct, as a result of egregious affirmative misconduct before the USPTO and/or intentional withholding of information that was but-for material to patentability, and/or unclean hands based on egregious misconduct before the USPTO in the prosecution of the MMI Patent Portfolio.

150.    Defendants knew that the '098 and '188 Patents asserted against Guardian and its customers were invalid and unenforceable at the time of those assertions and attempted assertions, as described in paragraphs 33 to 94, above.

151.    As a direct and proximate result of Defendants' unlawful conduct, competition in the Market has been severely harmed through price control, less innovation, lower quality, and fewer options for customers.

152.    As a direct and proximate result of Defendants' unlawful conduct, Guardian has been harmed in an amount to be established at trial. Guardian's damages include the attorneys' fees and costs it has been forced to incur in defending against Defendants' baseless claims for infringement against Guardian and its customers, as well as the anti-competitive harm it has suffered as a result of Defendants' unlawful attempt to acquire and maintain a monopoly in the Market, including loss of past and future profits and loss of past and future customers and customer goodwill.

153.    Defendants' unlawful conduct will continue unless enjoined, resulting in irreparable injury to Guardian for which it has no adequate remedy at law.

/ / /

36

1260427.3

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SIXTH CLAIM FOR RELIEF

*Handgards:* **Attempted Monopolization in Violation of § 2**

**of the Sherman Act, 15 U.S.C. § 2**

154.    Guardian incorporates and realleges paragraphs 1–153 herein by reference.

155.    Defendants have attempted to monopolize the Public Safety Background Investigation Software Management Market, a nationwide market in which Defendants are actively engaged in interstate commerce.

156.    Defendants have attempted to monopolize the Market with the specific intent to do so through sham legal actions asserting infringement of MMI Patent Portfolio against Guardian and its customers, creating a dangerous probability that Defendants will obtain a monopoly in the Market, in violation of Section 2 of the Sherman Act (15 U.S.C. § 2).

157.    As a direct and proximate result of Defendants' unlawful conduct, competition in the Market has been severely harmed through price control, less innovation, lower quality, and fewer options for customers.

158.    As a direct and proximate result of Defendants' unlawful conduct, Guardian has been harmed in an amount to be established at trial. Guardian's damages include the attorneys' fees and costs it has been forced to incur in defending against Defendants' baseless claims for infringement against Guardian and its customers, as well as the anti-competitive harm it has suffered as a result of Defendants' unlawful attempt to acquire and maintain a monopoly in the Market, including loss of past and future profits and loss of past and future customers and customer goodwill.

159.    Defendants' unlawful conduct will continue unless enjoined, resulting in irreparable injury to Guardian for which it has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF

**California Unfair Competition**

**CAL BUS. & PROF. CODE § 17200**

160.    Guardian incorporates and realleges paragraphs 1–159 herein by reference.

/ / /

37

COMPLAINT                                                    1260427.3

161.   Defendants' unfair or fraudulent business actions and unfair, deceptive, untrue, or misleading advertising is prohibited by Chapter 1 of Part 3 of Division 7 of the California Business and Professions Code.

162.   Defendants have engaged in unfair competition and should, therefore, be enjoined by this court, preventing Defendants from the use or employment by any person of any practice which constitutes unfair competition, as is necessary to restore Guardian's interests.

163.   Defendants have realized revenue and profits by virtue of their wrongful acts that they otherwise would not have obtained and to which they are not entitled. Guardian is entitled to Civil Penalties as indicated in Cal. Bus. & Prof. Code § 17206.

164.   Defendants' conduct injured Guardian's commercial interest in its sales and profits and its business in an amount of damages to be determined at trial.

165.   Defendants' conduct has caused and, unless and until such acts are restrained and enjoined by this court, will continue to cause irreparable injury to Guardian.

166.   As a result of Defendants' actions, Guardian has suffered and will continue to suffer damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

### California False Advertising

### CAL BUS. & PROF. CODE § 17500

167.   Guardian incorporates and realleges paragraphs 1–166 herein by reference.

168.   Defendants disseminated false, misleading, and/or disparaging statements knowing that the statements were false or in reckless disregard for the truth of the matter, with the intention selling their own services.

169.   Defendants have made false, misleading, and/or disparaging statements nationwide, including in California, and those statements were further disseminated to the relevant purchasing public in the Market, including in California.

170.   Defendants' false, misleading, and/or disparaging statements have misled, or will likely mislead, actual or potential purchasers of Guardian's services, damaged Guardian's reputation in the Market, lessened the goodwill in the Market associated with Guardian's services,

38

COMPLAINT

1260427.3

and wrongfully diverted sales of services to Defendants. As a result, Guardian has suffered pecuniary losses as a result of Defendants' false, misleading, and disparaging statements.

171.    Defendants' conduct has caused and, unless and until such acts are restrained and enjoined by this court, will continue to cause irreparable injury to Guardian.

172.    As a result of Defendants' actions, Guardian has suffered and will continue to suffer damages in an amount to be proven at trial.

**NINTH CLAIM FOR RELIEF**

**Tortious Interference with Contract**

173.    Guardian incorporates and realleges paragraphs 1–172 herein by reference.

174.    Defendants knew when soliciting, attempting to enforce, and/or threatening to enforce its fraudulently-obtained patent portfolio against Guardian's actual customers that Defendants had procured those patents through fraud committed on the USPTO.

175.    Such solicitation, attempted and/or threatened enforcement resulted in current Guardian customers electing to no longer use the Guardian Platform.

176.    Those actions and those described above constitute intentional interference with Guardian's contractual and business relationships.

177.    Guardian has been damaged by such interference and is entitled to an award of compensatory and punitive damages in an amount to be determined at trial but in excess of $75,000.

178.     Guardian is entitled to judgment in its favor and against Defendants in an amount in excess of $75,000, plus its costs, including reasonable attorneys' fees, plus prejudgment and post-judgment interest as provided by law.

**TENTH CLAIM FOR RELIEF**

**Tortious Interference with Prospective Business Advantage**

179.    Guardian incorporates and realleges paragraphs 1–178 herein by reference.

180.    Defendants knew when soliciting, attempting to enforce, and/or threatening to enforce its fraudulently-obtained patent portfolio against Guardian's prospective customers that Defendants had procured those patents through fraud committed on the USPTO.

/ / /

39

181.   Such solicitation, attempted and/or threatened enforcement resulted in prospective Guardian customers electing to not use the Guardian Platform and, instead, use Defendants' eSOPH software.

182.   Those actions and those described above constitute intentional interference with Guardian's prospective business relationships.

183.   Guardian has been damaged by such interference and is entitled to an award of compensatory and punitive damages in an amount to be determined at trial but in excess of $75,000.

184.   Guardian is entitled to judgment in its favor and against Defendants in an amount in excess of $75,000, plus its costs, including reasonable attorneys' fees, plus prejudgment and post-judgment interest as provided by law.

## ELEVENTH CLAIM FOR RELIEF

### Trade Libel

185.   Guardian incorporates and realleges paragraphs 1–184 herein by reference.

186.   Defendants' communications to Guardian's current and prospective customers regarding the status of the various litigations and proceedings between Guardian, its customers, and Defendants, and Defendants' "memo" and "open letter" published by Defendants on their website and disseminated to multiple Guardian current and prospective customers, contain false statements that are injurious to Guardian and its business of providing public safety background investigation management software to public safety agencies.

187.   Specifically, Defendants have falsely represented to numerous Guardian customers that the USPTO issued a decision that "illustrates Guardian Alliance Technologies' Infringement and failed attempt to cover his (*sic*) patent infringement/theft." That statement is literally false, as the USPTO never issued any decision finding that Guardian infringed any of the Defendants' patents and, in fact, does not even have the authority or jurisdiction to do so.

188.   Moreover, the "memo" and "open" letter contain literal falsehoods regarding the status of Defendants' various litigations and proceedings against Guardian and its customers, as well as literal falsehoods regarding the integrity of applicant data collected and stored in the Guardian Platform.

COMPLAINT                                                                 1260427.3

189.    Defendants have always been aware of its accused statements' false, malicious, and injurious nature. Even after Guardian and its counsel made Defendants aware of the literal falsity of its statements, Defendants refused to retract the statements and, in fact, ramped up their dissemination of the same. Defendants are, therefore, without excuse or justification for their acts and statements. They have made such statements and engaged in such acts with disinterested malevolence and hatred, all for inflicting harm upon Guardian.

190.    As a direct result of Defendants' false statements, multiple Guardian customers have elected to discontinue their use of the Guardian Platform. This includes but is not limited to the Fresno (CA) Police Department, the City of Fort Worth (TX), and the City of Buckeye (AZ), resulting in actual damages to Guardian in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Guardian prays for judgment and relief as follows:

A.    A declaratory judgment that the '098 Patent is unenforceable for Defendants' inequitable conduct;

B.    A declaratory judgment that the '188 Patent is unenforceable for Defendants' inequitable conduct;

C.    A declaratory judgment that the '098 Patent is invalid;

D.    A declaratory judgment that the '188 Patent is invalid;

E.    A judgment in favor of Guardian declaring that Defendants have attempted to monopolize the Public Safety Background Investigation Management Software Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

F.    A permanent injunction against Defendants, their respective officers, agents, servants, directors, and employees, and all persons in active concert or participation with each, from monopolizing and attempting to monopolize the relevant markets under Section 16 of the Clayton Act, 15 U.S.C. § 26;

G.    A permanent injunction against Defendants from enforcing or attempting to enforce any claims of any patent or patent application in the MMI Patent Portfolio or any claims

/ / /

COMPLAINT                                                                                              1260427.3

of any patent or patent application that claims priority to any patent or patent application in the MMI Patent Portfolio;

H.     A permanent injunction against Defendants from using any false or misleading statements which can or are likely to influence customers' purchasing decisions of any of Defendants' services or products;

I.     A judgment and order requiring Defendants to account to Guardian for all sales and profits from the sale of any of Defendants' services or products as a result of any false or misleading statements, or for any sum in addition to that amount the Court and/or jury awards;

J.     An award to Guardian of actual and compensatory damages, including but not limited to lost profits and attorneys' fees and costs, trebled by law, plus interest;

K.     A judgment and order requiring Defendants to disgorge its profits and other ill-gotten gains resulting from their wrongful conduct;

L.     A judgment and order for Guardian to be awarded punitive and/or enhanced damages because of Defendants' wanton and deliberate illegal acts committed with oppression, fraud, and malice;

M.     A judgment finding that this is an exceptional case and awarding attorneys' fees pursuant to 35 U.S.C. § 285;

N.     A judgment and order allowing Guardian to recover all taxable costs of this actions, including reasonable attorneys' fees and both pre-and post-judgment interest; and

O.     Any and all other relief, at law or equity, to which Guardian may show itself to be entitled.

**<u>DEMAND FOR JURY TRIAL</u>**

Under Rule 38 of the Federal Rules of Civil Procedure, Guardian requests a trial by jury of any issues so triable by right.

/ / /

/ / /

/ / /

/ / /

COMPLAINT                                                                                      1260427.3

Dated:  August 5, 2022

BOUTIN JONES INC.
Attorneys at Law


By: ____/s/ Robert D. Swanson_____
Robert D. Swanson
Daniel S. Stouder

*and*

DUNLAP CODDING PC
Douglas J. Sorocco
Evan W. Talley

Attorneys for Plaintiff
Guardian Alliance Technologies, Inc.

COMPLAINT
1260427.3