1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                          ----oo0oo----

11

12  GUARDIAN ALLIANCE TECHNOLOGIES,        No. 2:22-cv-01390 WBS AC
    INC.,
13
              Plaintiff,
14
         v.                               MEMORANDUM AND ORDER RE:
                                          DEFENDANTS' MOTION TO DISMISS
15                                        AND MOTION TO STRIKE
    MILLER MENDEL, INC. and TYLER
16  MILLER,

17            Defendants.

18

19                          ----oo0oo----

20          Plaintiff Guardian Alliance Technologies, Inc.

21  ("Guardian") brought this action against defendants Miller

22  Mendel, Inc. and Tyler Miller (collectively, "Miller Mendel"),

23  seeking declarations that two of defendants' patents are invalid,

24  asserting claims under the Sherman Antitrust Act, 15 U.S.C § 2,

25  and alleging various violations of California state law.  (Compl.

26  (Docket No. 1).)  Before the court are Miller Mendel's motion to

27  dismiss the complaint in its entirety (Docket No. 40) and motion

28  to strike Guardian's state law claims pursuant to California's

                                  1

1    anti-SLAPP[1] statute, Cal. Civ. Code § 425.16 (Docket No. 41).

2    I.    <u>Background & Procedural History</u>[2]

3              Plaintiff Guardian is a California-based company that

4    creates and sells access to software for managing employee

5    background checks, primarily for government organizations and law

6    enforcement agencies.  (Compl. ¶¶ 4, 28.)  Defendant Miller

7    Mendel, Inc. is a Seattle-based company that creates and sells

8    access to similar software.  (<u>Id.</u> ¶¶ 5, 28.)  Defendant Tyler

9    Miller is the Chief Executive Officer of Miller Mendel, Inc.

10   (<u>See</u> Ex. A to Rylander Decl. (Docket No. 40-2 at 8).)

11             In April 2011, Tyler Miller filed a provisional patent

12   application with the U.S. Patent and Trademark Office, U.S.

13   Patent Application No. 61/472,556, covering public safety

14   background investigation management software.  (Compl. ¶¶ 48-49.)

15   In April 2012, Miller filed a non-provisional patent application

16   claiming priority to the provisional patent application.  (<u>Id.</u> ¶

17   53.)  On June 30, 2015, Miller was issued U.S. Patent No.

18   9,070,098 (the "'098 Patent").  (<u>Id.</u> ¶ 55.)  In May 2015, Miller

19   filed another non-provisional patent application, resulting in

20   the issuance of U.S. Patent No. 10,043,188 (the "'188 Patent") on

21   August 7, 2018.  (<u>Id.</u> ¶¶ 56, 58.)  Tyler Miller licensed both

22   patents to Miller Mendel, Inc.  (<u>Id.</u> ¶ 59.)  The two patents both

23   concern pre-employment background check software and are similar,

24   sharing a substantial amount of identical claim language.  (<u>See</u>

25   _____

26       [1]    "SLAPP" refers to a "strategic lawsuit against public
     participation."

27
         [2]    All facts recited in this Order are as alleged in the
28   Complaint, unless otherwise noted.

                                      2

1    Compl. ¶ 80; Exs. 1-2 to Compl.)

2         Miller Mendel, Inc. and Tyler Miller have filed several

3    lawsuits in federal district courts alleging that Guardian's

4    customers infringed the '188 Patent through use of Guardian's

5    software.  In October 2018, both Miller Mendel, Inc. and Tyler

6    Miller sued the City of Oklahoma City in the Western District of

7    Oklahoma (the "Oklahoma Action").  See Case No. 5:18-cv-00990

8    (W.D. Okla.).[3]  In February 2021, Miller Mendel, Inc. sued

9    Washington County, Oregon and the Washington County Sheriff's

10   Office in the District of Oregon (the "Oregon Action").  See Case

11   No. 3:21-cv-00168 (D. Ore.).  In May 2021, Miller Mendel, Inc.

12   and Tyler Miller sued Alaska State Troopers and James E.

13   Cockrell, the Commissioner of the State of Alaska Department of

14   Public Safety, in the District of Alaska (the "Alaska Action").

15   See Case No. 3:21-cv-00129 (D. Alaska).  In December 2021, Miller

16   Mendel, Inc. sued the City of Anna, Texas in the Eastern District

17   of Texas (the "Texas Action").  See Case No. 2:21-cv-00445 (E.D.

18   Tex.).  Guardian defended its customers in these actions pursuant

19   to indemnification agreements.  (See Compl. ¶¶ 41, 99, 101-103.)

20   In August 2022, Guardian filed the instant action.

21        The court in the Texas Action found that claims 1, 5,

22   and 15 of Miller Mendel's '188 Patent were invalid because they

23   were directed at patent-ineligible matter.  See Miller Mendel,

24   Inc. v. City of Anna, Tex., No. 2:21-cv-00445 JRG, 2022 WL

25   _____

26        [3]    In October 2019, Guardian (as a non-party in the
     Oklahoma Action) filed a petition with the Patent Trial and
27   Appeal Board ("PTAB") for inter partes review of the validity of
     the '188 Patent, IPR2020-00031.  (Compl. ¶ 119, Ex. 30.)  The
28   PTAB denied review on March 26, 2020.  (Id.)

1437686, at *10 (E.D. Tex. Apr. 14, 2022).[4]  The court also

denied Guardian's motion for attorney's fees.  Id., 2022 WL

2704790, at *6 (E.D. Tex. June 13, 2022).  Both decisions were

affirmed by the Federal Circuit.  See id., 107 F.4th 1345, 1356–

57 (Fed. Cir. 2024), cert. denied, 145 S. Ct. 593 (2024).

        Following the Federal Circuit's decision, Miller Mendel

sought voluntary dismissal of the Oregon Action and the Alaska

Action, both of which were closed in January 2025.  (See Oregon

Action, Docket Nos. 29, 33; Alaska Action, Docket Nos. 46, 50.)

The Oklahoma Action remains pending in the Western District of

Oklahoma.

II.  Federal Claims

        Guardian's first and second claims seek declarations

that the '098 and '188 patents are unenforceable due to

defendants' inequitable conduct.  The third and fourth claims

seek declarations that the '098 and '188 patents are invalid

under 35 U.S.C. § 101 et seq.  The fifth and sixth claims allege

violations of section 2 of the Sherman Act.

        A.  Declaratory Relief Claims (Claims 1, 2, 3, and 4)

                1.  First-to-File Doctrine

        The first-to-file rule is "a judicially created

doctrine of federal comity, which applies when two cases

involving substantially similar issues and parties have been

filed in different districts."  In re Bozic, 888 F.3d 1048, 1051

(9th Cir. 2018) (internal quotation marks and citations omitted).

"Under that rule, the second district court has the discretion to

---

        [4]  The other claims contained in the patent were not at
issue.

1    transfer, stay, or dismiss the second case in the interest of

2    efficiency and judicial economy." Id. at 1051-52 (internal

3    quotation marks and citation omitted).  To determine whether to

4    apply the rule, a district court considers three factors:

5    "chronology of the lawsuits, similarity of the parties, and

6    similarity of the issues." Kohn Law Grp., Inc. v. Auto Parts

7    Mfg. Miss., Inc., 787 F.3d 1237, 1240 (9th Cir. 2015).  "When

8    applying the first-to-file rule, courts should be driven to

9    maximize 'economy, consistency, and comity.'" Id. (quoting Cadle

10   Co. v. Whataburger of Alice, Inc., 174 F.3d 599, 604 (5th Cir.

11   1999)); see also Pacesetter Sys. Inc. v. Medtronic, Inc., 678

12   F.2d 93, 95 (9th Cir. 1982) (explaining that the first-to-file

13   rule "is not a rigid or inflexible rule to be mechanically

14   applied, but rather is to be applied with a view to the dictates

15   of sound judicial administration").

16        The only related action that remains pending is the

17   Oklahoma Action, which was filed prior to this case.  There, both

18   Miller Mendel, Inc. and Tyler Miller are plaintiffs, and Guardian

19   has defended its indemnitee, the City of Oklahoma City.  (See

20   Compl. ¶ 99.)  In the Oklahoma Action, Miller Mendel, Inc. and

21   Tyler Miller seek a declaration that they did not engage in

22   inequitable conduct or patent fraud with respect to their

23   patents, including the '188 Patent.  (See Oklahoma Action, Docket

24   No. 139-1 ¶ 17, No. 104 ¶ 34.)  There is "substantial overlap"

25   between those claims and Guardian's first and second claims in

26   this action, which also concern alleged fraud or inequitable

27   conduct by Miller Mendel.  See Kohn Law Grp., 787 F.3d at 1241.

28   However, in this action, Guardian also asserts that the entirety

1  of the '188 and '098 patents are invalid because they cover

2  unpatentable subject matter.  No parallel claims concerning

3  patentability are asserted in the Oklahoma Action.  Dismissal of

4  the claims in this action seeking declarations that the patents

5  cover unpatentable material would therefore be unwarranted.

6          The inequitable conduct claims might be appropriate to

7  stay given their similarity to the parallel claim in the Oklahoma

8  Action.  A transfer of this action to the Western District of

9  Oklahoma is also a possibility.  However, neither party has

10  requested a stay or transfer, and it is not clear to the court

11  whether a stay or transfer would be prudent here.  The judge in

12  the Oklahoma Action previously held that patent infringement

13  claims cannot be asserted against Guardian in the Western

14  District of Oklahoma due to improper venue.  (See Oklahoma

15  Action, Docket No. 103.)  While no such infringement claims are

16  asserted against Guardian here, as Guardian is the plaintiff, it

17  is possible that Miller Mendel could assert a counterclaim to

18  that effect.

19          Further, Guardian represented in a status report to the

20  Oklahoma court that it intended to file a motion to transfer the

21  remaining Oklahoma claims to this court. (See Oklahoma Action,

22  Docket No. 142.)  Miller Mendel apparently anticipates the filing

23  of such a motion to transfer, as the instant motion to dismiss

24  before this court states that the remaining Oklahoma claims

25  against Guardian "are pending transfer to [the Eastern District

26  of California] for ultimate resolution."  (Docket No. 40 at 20.)

27          Given these circumstances, the court will not order a

28  stay or transfer at this time.  However, either party may file a

1    motion requesting a stay or transfer in favor of the Oklahoma

2    Action.

3          For the foregoing reasons, claims one through four will

4    not be dismissed based on the first-to-file doctrine.

5                2.    <u>Standing under Declaratory Judgment Act</u>

6          The Declaratory Judgment Act provides that "[i]n a case

7    of actual controversy within its jurisdiction . . . any court of

8    the United States, upon the filing of an appropriate pleading,

9    may declare the rights and other legal relations of any

10   interested party seeking such declaration, whether or not further

11   relief is or could be sought."  28 U.S.C. § 2201(a).

12         In the patent or trademark infringement context, "a

13   plaintiff has standing to seek declaratory relief of non-

14   infringement if he demonstrates 'a real and reasonable

15   apprehension that he will be subject to liability' if he

16   continues with his course of conduct."  See <u>San Diego Cnty.</u>

17   <u>Credit Union v. Citizens Equity First Credit Union</u>, 65 F.4th

18   1012, 1023 (9th Cir.), <u>cert. denied</u>, 144 S. Ct. 190 (2023)

19   (quoting <u>Societe de Conditionnement en Aluminium v. Hunter Eng'g</u>

20   <u>Co.</u>, 655 F.2d 938, 944-45 (9th Cir. 1981)).  "Such an

21   apprehension can exist even absent an explicit threat to sue."

22   <u>Id.</u>

23         Guardian has established a "real and reasonable

24   apprehension" of patent infringement proceedings sufficient to

25   establish standing under the Declaratory Judgment Act.  Indeed,

26   the threat of patent enforcement litigation by Miller Mendel is

27   about as "real" as it gets.  Miller Mendel has already filed

28   multiple lawsuits against Guardian's indemnified customers

                                    7

1  concerning the validity or infringement of the '188 Patent,

2  leading to protracted litigation including appeal to the Federal

3  Circuit.  Although the prior suits have not included the '098

4  Patent, the two patents are closely related, and Miller Mendel

5  previously sent a letter to Guardian stating that "further

6  investigation will become necessary" if Guardian did not ensure

7  non-infringement of the '098 Patent (Ex. 19 to Compl.).  See

8  Chesebrough-Pond's, Inc. v. Faberge, Inc., 666 F.2d 393, 395–96

9  (9th Cir. 1982) (plaintiff had standing under Declaratory

10 Judgment Act where it filed suit three years following letter

11 threatening to oppose trademark application before the Patent and

12 Trademark Office) (cited with approval in Citizens Equity, 65

13 F.4th at 1026).  Accordingly, the declaratory relief claims will

14 not be dismissed for lack of standing.

15      B.   Sherman Act Claims (Claims 5 and 6)

16           Guardian brings two claims under § 2 of the Sherman

17 Act.  The fifth claim alleges attempted monopolization of the

18 relevant market via sham litigation.  See Handgards, Inc. v.

19 Ethicon, Inc., 601 F.2d 986, 987 (9th Cir. 1979).  The sixth

20 claim alleges attempted monopolization of the relevant market via

21 fraud on the U.S. Patent and Trademark Office.  See Walker

22 Process Equip., Inc. v. Food Mach. & Chem. Corp., 382 U.S. 172,

23 177 (1965).

24           Miller Mendel argues that both Sherman Act claims fail

25 on the ground of issue preclusion, and that the sixth claim

26 alleging fraud fails to satisfy the particularity requirements of

27

28

8

1    Federal Rule of Civil Procedure 9(b).[5]

2                    1.    Issue Preclusion

3              "Issue preclusion, or collateral estoppel, 'bars

4    successive litigation of an issue of fact or law actually

5    litigated and resolved in a valid court determination essential

6    to the prior judgment,' even if the issue recurs in the context

7    of a different claim."  Hansen v. Musk, 122 F.4th 1162, 1173 (9th

8    Cir. 2024) (quoting Taylor v. Sturgell, 553 U.S. 880, 892

9    (2008)).  "For issue preclusion to apply, the party seeking

10   preclusion must show '(1) the issue at stake was identical in

11   both proceedings; (2) the issue was actually litigated and

12   decided in the prior proceedings; (3) there was a full and fair

13   opportunity to litigate the issue; and (4) the issue was

14   necessary to decide the merits.'"  Id. (quoting Howard v. City of

15   Coos Bay, 871 F.3d 1032, 1041 (9th Cir. 2017)).

16             Miller Mendel argues that issue preclusion applies to

17   the Sherman Act claims based on the attorney's fees decision from

18   the Texas Action.  There, the district court found that

19   attorney's fees were not warranted under 35 U.S.C. § 285, which

20   authorizes fees for patent cases only in "exceptional"

21   circumstances.  The court found that the case was not

22

23             [5]   Miller Mendel further argues that both Sherman Act
     claims must be dismissed due to Guardian's failure to plead that
24   Miller Mendel possessed monopoly power over the market.  This
     argument is baseless.  In addition to extensive allegations
25   concerning anti-competitive behavior, Guardian specifically
     alleges that Miller Mendel "was able to capture a dominant
26   position quickly and is currently the dominant Market
     participant, controlling at least 70% of the total dollars
27   expended annually by public safety agencies for public safety
     background investigation management software."  (Compl. ¶ 29.)
28

1   "exceptional" because "finding the '188 Patent ineligibl[e] at

2   the 12(c) stage" did not mean Miller Mendel's arguments to the

3   contrary were "frivolous or objectively unreasonable," and

4   "Miller Mendel was entitled to believe that the '188 Patent was

5   valid after it was examined and allowed by the [U.S. Patent and

6   Trademark Office]."  2022 WL 2704790, at *6.

7            Issue preclusion is not applicable based on the

8   attorney's fees decision in the Texas Action.  The Texas court

9   merely made the "factual determination" that the case was not

10  exceptional such that fees were warranted.  See id., at *2.  This

11  issue is obviously not "identical" to the questions of whether

12  Miller Mendel acted fraudulently in acquiring the patents or

13  pursued sham patent litigation in violation of the Sherman Act.

14  See Sec. & Exch. Comm'n v. Stein, 906 F.3d 823, 829 (9th Cir.

15  2018) (whether issues involve "application of the same rule of

16  law" is relevant to determining whether issues are "identical").

17  Further, the Texas decision fails the fourth requirement for

18  issue preclusion to apply, as attorney's fees are not a merits

19  issue; to the contrary, by the time the court in the Texas Action

20  considered Guardian's request for attorney's fees, it had already

21  issued a decision on the merits.  See 598 F. Supp. 3d 486.

22  Accordingly, the Sherman Act claims are not subject to issue

23  preclusion.

24            2.   Rule 9(b)

25            Federal Rule of Civil Procedure 9(b) states: "In

26  alleging fraud or mistake, a party must state with particularity

27  the circumstances constituting fraud or mistake.  Malice, intent,

28  knowledge, and other conditions of a person's mind may be alleged

1    generally."  Rule 9(b) "demands that the circumstances

2    constituting the alleged fraud be specific enough to give

3    defendants notice of the particular misconduct so that they can

4    defend against the charge and not just deny that they have done

5    anything wrong."  Kearns v. Ford Motor Co., 567 F.3d 1120, 1124

6    (9th Cir. 2009) (cleaned up).  "Averments of fraud must be

7    accompanied by 'the who, what, when, where, and how' of the

8    misconduct charged."  Id.

9         Miller Mendel argues that Guardian fails to plead with

10    particularity that Miller Mendel "intended to defraud" the Patent

11    and Trademark Office.  This argument is entirely meritless.  Rule

12    9(b) states that "intent . . . may be alleged generally," which

13    Guardian has done.  (See, e.g., Compl. ¶ 148 ("Defendants have

14    attempted to monopolize the Market with the specific intent to do

15    so through their fraudulent misrepresentations and omissions to

16    the [Patent and Trademark Office]").)

17         The complaint also adequately sets out the "who, what,

18    when, where, and how" of the alleged fraud.  Guardian alleges

19    that in the course of obtaining the '098 and '188 patents, Miller

20    Mendel "deliberately and purposefully withheld material

21    information" from the Patent and Trademark Office, including

22    "information about third-party prior art systems of which

23    Defendants were aware."  (Compl. ¶ 34.)  The complaint further

24    alleges that Miller Mendel learned of the prior art at issue in

25    2011, prior to filing the patent applications; details the

26    relevant patent application processes; states that Miller Mendel

27    failed to "file an information disclosure statement [concerning

28    the prior art] with the [Patent and Trademark Office] (despite

1    their continuing duty of disclosure under 37 C.F.R. § 1.56 to do

2    so)"; points to specific steps during the application process

3    where Miller Mendel allegedly failed to disclose the prior art

4    information, even including quotes from patent application

5    materials that Guardian contends are misleading; and alleges that

6    had the Patent and Trademark Office been made aware of the

7    information at issue, Miller Mendel would not have received the

8    patents.  (See id. ¶¶ 51-78.)  Accordingly, Guardian's claim

9    alleging fraud on the Patent and Trademark Office satisfies the

10   particularity requirements of Rule 9(b).

11   III. <u>State Law Claims</u>

12          Guardian alleges unfair competition in violation of

13   California Business and Professions Code § 17200; false

14   advertising in violation of Business and Professions Code §

15   17500; tortious interference with contract; tortious interference

16   with prospective economic advantage; and trade libel.  Miller

17   Mendel argues that these claims are barred by the California

18   anti-SLAPP law and should therefore be stricken.  Miller Mendel

19   also argues that these claims should be dismissed because they

20   are subject to California's litigation privilege, are barred by

21   <u>Noerr-Pennington</u> immunity,[6] and fail to state a claim.

22          A.   <u>Anti-SLAPP Motion to Strike</u>

23          A strategic lawsuit against public participation

24   ("SLAPP") is a "civil lawsuit that is aimed at preventing

25   _____

26          [6]   This doctrine takes its name from the first two cases
     that the Supreme Court considered in this jurisprudential line.

27   <u>See</u> <u>E. R.R. Presidents' Conf. v. Noerr Motor Freight, Inc.</u>, 365
     U.S. 127 (1961), and <u>United Mine Workers of America v.</u>

28   <u>Pennington</u>, 381 U.S. 657 (1965).

citizens from exercising their political rights or punishing
those who have done so." Simpson Strong-Tie Co. v. Gore, 49 Cal.
4th 12, 21 (2010).  "While SLAPP suits masquerade as ordinary
lawsuits such as defamation and interference with prospective
economic advantage, they are generally meritless suits brought
primarily to chill the exercise of free speech or petition rights
by the threat of severe economic sanctions against the defendant,
and not to vindicate a legally cognizable right." Id. (internal
quotation marks omitted).  California's anti-SLAPP statute, Cal.
Code. Civ. Proc. § 425.16, "authorize[s] the filing of a special
motion to strike to expedite the early dismissal of these
unmeritorious claims." Id.

The anti-SLAPP statute is subject to an exemption for
commercial speech.  An action arises from commercial speech and
is therefore exempt from the anti-SLAPP law when (1) "the cause
of action is against a person primarily engaged in the business
of selling or leasing goods or services;" (2) "the cause of
action arises from a statement or conduct by that person
consisting of representations of fact about that person's or a
business competitor's business operations, goods, or services;"
(3) "the statement or conduct was made either for the purpose of
obtaining approval for, promoting, or securing sales or leases
of, or commercial transactions in, the person's goods or services
or in the course of delivering the person's goods or services;"
and (4) "the intended audience for the statement or conduct" is
"'an actual or potential buyer or customer, or a person likely to
repeat the statement to, or otherwise influence, an actual or
potential buyer or customer.'" See id. at 30 (quoting Cal. Code.

13

1   Civ. Proc. § 425.17(c)).

2           The commercial speech exemption applies here.  First,

3   Miller Mendel is primarily engaged in the business of selling

4   goods or services, namely their background check software.

5   Second, Guardian's claims arise in part from representations of

6   fact that Miller Mendel made to Guardian's customers concerning

7   Guardian's product, for example that "[t]hrough the way

8   [Guardian's software] operates and their Terms of Service and

9   Privacy Policy, [customers] have no first-level control over

10  [their] applicants' data," leading customers to "likely lose

11  control over public records law exemptions, ability to object to

12  discovery requests and also, in general, lose security over the

13  applicants' data."  (See Ex. 28 to Compl.)  Third, the statements

14  at issue were made for the purpose of persuading Guardian's

15  customers or potential customers to use Miller Mendel's software

16  rather than Guardian's.  For example, the above statement

17  concerning the purported security failures of Guardian's software

18  was disseminated in emails sent directly to several of Guardian's

19  customers that asked the customers to "cease use" of Guardian's

20  software.  Those emails also represented that Guardian's software

21  infringed on Miller Mendel's patent, thereby presenting Miller

22  Mendel's software as an alternative to Guardian's product.  (See

23  id.)  Finally, the statements at issue were made either directly

24  to Guardian's potential customers (see id.) or disseminated to an

25  intended audience that included Guardian's actual or potential

26  customers (see Ex. 30 to Compl.).  Accordingly, Guardian's state

27  law claims are subject to the commercial speech exemption and

28

14

1   Miller Mendel's anti-SLAPP motion to strike will be denied.[7]

2       B.   *Noerr-Pennington* Immunity

3       The Noerr-Pennington doctrine, which is derived from

4   the Petition Clause of the First Amendment, "provides that those

5   who petition any department of the government for redress,"

6   including the judicial branch, "are generally immune from . . .

7   liability for their petitioning conduct."  See B&G Foods N. Am.,

8   Inc. v. Embry, 29 F.4th 527, 535 (9th Cir. 2022) (internal

9   quotation marks omitted).  Noerr-Pennington applies to state law

10  claims.  Theme Promotions, Inc. v. News Am. Mktg. FSI, 546 F.3d

11  991, 1007 (9th Cir. 2008).

12      The Noerr-Pennington doctrine does not grant immunity,

13  however, where the "sham exception" applies.  See Kaiser Found.

14  Health Plan, Inc. v. Abbott Lab'ys, Inc., 552 F.3d 1033, 1044

15  (9th Cir. 2009).  To fall under the sham exception, the

16  litigation at issue must be "objectively baseless in the sense

17  that no reasonable litigant could realistically expect success on

18  the merits."  Prof. Real Estate Inv'rs, Inc. v. Columbia Pictures

19  Indus., Inc., 508 U.S. 49, 60 (1993).  If the lawsuit is

20  objectively baseless, the court "examine[s] the litigant's

21  subjective motivation" to determine whether the lawsuit "conceals

22  an attempt to interfere directly with the business relationships

23  _____

24      [7]   Miller Mendel's reply brief does not engage with the
    elements of the commercial speech exemption, instead appearing to
25  argue in circular fashion that because the claims at issue fall
    within the scope of the anti-SLAPP statute, they do not qualify
26  for the commercial speech exemption therefrom.  If Miller
    Mendel's brief is trying to argue anything more than that, the
27  court is unable to understand that argument.  Further, at oral
    argument, counsel failed to rebut Guardian's showing that the
28  elements of the commercial speech exemption are satisfied.

1    of a competitor through the use of the governmental process -- as

2    opposed to the outcome of that process -- as an anticompetitive

3    weapon." Id. at 60-61 (cleaned up).

4         The Ninth Circuit has explained that in a case

5    involving a "fraudulently obtained patent, that which immunized

6    the [patent enforcement litigation] from . . . liability (the

7    patent) is, in effect, a nullity because of the underlying

8    fraud." Hydranautics v. FilmTec Corp., 70 F.3d 533, 538 (9th

9    Cir. 1995) (quoting Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d

10   155 (9th Cir. 1993)). Accordingly, where intentional fraud in

11   the procurement of the patent is alleged, dismissal at the

12   pleadings stage pursuant to the Noerr-Pennington doctrine is

13   improper. See id. Put differently, "[o]bjective baselessness

14   may be shown by demonstrating that the 'infringement action [is]

15   based on a fraudulently obtained patent.'" Shenzhen Smoore Tech.

16   Co. v. Next Level Ventures, LLC, No. 2:22-cv-07646, 2024 WL

17   5317246, at *7 (C.D. Cal. Dec. 4, 2024) (quoting Hydranautics, 70

18   F.3d at 538). See also Kaiser Found. Health Plan, 552 F.3d at

19   1045 (the "fraud or misrepresentation" warranting application of

20   the sham exception to Noerr-Pennington can include fraud

21   "directed to the federal Patent and Trademark Office [], not

22   merely to a court").

23        Because Guardian has plausibly alleged that Miller

24   Mendel (1) engaged in intentional fraud in obtaining the patent

25   underlying the enforcement litigation (see Compl. ¶¶ 33-78), and

26   (2) intended the litigation to interfere with Guardian's business

27   relationships (see id. ¶¶ 12-18, 95-127), dismissal of the state

28   law claims (to the extent they are premised on that litigation)

16

1  is not warranted under Noerr-Pennington.  See Shenzhen Smoore,

2  2024 WL 5317246, at *7 (declining to grant immunity under Noerr-

3  Pennington at the pleadings stage where complaint alleged that

4  defendant knew the patent at issue was obtained fraudulently and

5  pursued a patent enforcement action nonetheless).[8]

6      C.   Litigation Privilege

7          Miller Mendel asserts that Guardian's state law claims

8  are barred because they are premised on communications subject to

9  California's litigation privilege, Cal. Civ. Code § 47.  "[T]he

10 privilege applies to any communication (1) made in judicial or

11 quasi-judicial proceedings; (2) by litigants or other

12 participants authorized by law; (3) to achieve the objects of the

13 litigation; and (4) that have some connection or logical relation

14 to the action."  Silberg v. Anderson, 50 Cal. 3d 205, 212 (1990).

15 The privilege "applies to any publication or other communication

16 . . . whether or not the publication is made in the courtroom or

17 in court pleadings, and whether or not any function of the court

18 or its officers is involved."  Rothman v. Jackson, 49 Cal. App.

19 4th 1134, 1140 (2d Dist. 1996).  If a "statement is made with a

20 good faith belief in a legally viable claim and in serious

21 contemplation of litigation, then the statement is sufficiently

22 _____

23      [8]  Miller Mendel also argues that "federal patent law
   preempts state-law tort liability for a patentholder's good faith
24 conduct in communications asserting infringement of its patent
   and warning about potential litigation."  See Lite-Netics, LLC v.
25 Nu Tsai Cap. LLC, 60 F.4th 1335, 1343 (Fed. Cir. 2023).  However,
   state claims "can survive federal preemption" when they are
26 "based on a showing of 'bad faith' action in asserting
   infringement."  See id.  The "bad faith" analysis is identical to
27 the sham exception's "objectively baseless" prong, see id.
   (citing Columbia Pictures, 508 U.S. at 60), and therefore does
28 not require separate discussion.

1  connected to litigation and will be protected by the litigation

2  privilege." <u>Blanchard v. DIRECTV, Inc.</u>, 123 Cal. App. 4th 903,

3  919 (2d Dist. 2004).

4         Guardian has alleged sufficient conduct not protected

5  by the litigation privilege to survive dismissal.  First,

6  Guardian's claims rely not only on Miller Mendel's infringement

7  litigation, but also the patent application process itself.  The

8  litigation privilege "is intended to assure utmost freedom of

9  communication between citizens and <u>public authorities whose</u>

10  <u>responsibility is to investigate and remedy wrongdoing</u>."  <u>Hagberg</u>

11  <u>v. California Fed. Bank</u>, 32 Cal. 4th 350, 360 (2004) (emphasis in

12  original).  As the Ninth Circuit explained in <u>Mindys Cosmetics,</u>

13  <u>Inc. v. Dakar</u>, an application to the Patent and Trademark Office

14  does not serve that purpose, because such an application is "not

15  filed in anticipation of litigation, nor [i]s it intended to

16  instigate official investigation into wrongdoing."  <u>See</u> 611 F.3d

17  590, 600 (9th Cir. 2010) (citing <u>Hagberg</u>, 32 Cal. 4th at 369);

18  <u>see also</u> <u>NICOR, Inc. v. SourceBlue, LLC</u>, No. 2:21-cv-05876, 2023

19  WL 6866329, at *25 (C.D. Cal. Aug. 30, 2023) (claim alleging that

20  defendant "[sought] a patent based on stolen proprietary

21  information" may not be barred by the litigation privilege).

22         Second, Guardian's claims are also premised in part on

23  communications arguably disseminated to a broader audience.  The

24  complaint alleges that Miller Mendel published an "open letter

25  regarding serious public concerns" about Guardian's software on

26  Miller Mendel's website.  (Compl. ¶ 118; Ex. 29 to Compl.)  While

27  there is no binding authority on point, several "California

28  courts have made clear that the privilege 'does not encompass

18

1  publication to the general public,'" for example social media

2  posts or press releases.  See Therabody, Inc. v. Hyper Ice, Inc.,

3  No. 8:24-cv-00378, 2024 WL 5316364, at *8 (C.D. Cal. Oct. 31,

4  2024) (quoting GetFugu, Inc. v. Patton Boggs LLP, 220 Cal. App.

5  4th 141, 153 (2d Dist. 2013)).  Such efforts to "'publicize the

6  alleged misdeeds'" of the opposing party by making statements

7  "directed to the public as a whole" might not be covered by the

8  litigation privilege.  See id., at *7-8 (quoting GetFugu, 220

9  Cal. App. 4th at 153); see also Cap Exp., LLC v. Zinus, Inc., No.

10  2:21-cv-07148, 2023 WL 6381821, at *6 (C.D. Cal. Sept. 28, 2023)

11  ("'Public mudslinging' in the form of Defendants' communications

12  accusing [the plaintiff] of unlawful infringement are not

13  afforded 'the same protections which section 47(b) gives to court

14  processes.'") (quoting Rothman, 49 Cal. App. 4th at 1146).  But

15  see UCP Int'l Co. Ltd. v. Balsam Brands Inc., 420 F. Supp. 3d

16  966, 982-83 (N.D. Cal. 2019) (citing Weiland Sliding Doors &

17  Windows, Inc. v. Panda Windows & Doors, LLC, 814 F. Supp. 2d

18  1033, 1041 (S.D. Cal. 2011)) (litigation privilege protected

19  statements concerning infringement litigation made on website

20  whose intended audience was customers).

21       Third, Miller Mendel's statements both directly to

22  customers and on the Miller Mendel website concerned not only the

23  patent infringement litigation, but also other unrelated issues

24  concerning Guardian's software -- for instance, the statement

25  discussed above pertaining to the software's alleged security

26  flaws.  Statements about Guardian's product entirely unrelated to

27  patent infringement do not have a connection or logical relation

28  to the infringement litigation.  See NICOR, 2023 WL 6866329, at

1  *25 (litigation privilege did not apply where alleged statements

2  were "not limited to enforcing patent rights"); Tri-Star Elecs.

3  Int'l, Inc. v. Preci-Dip Durtal SA, No. 08-cv-04226, 2011 WL

4  13176071, at *8 (C.D. Cal. May 27, 2011) (litigation privilege

5  did not apply to allegedly false "gratuitous disparaging

6  statements" about the quality of plaintiff's products, as those

7  statements "do not serve the objects of the litigation because

8  [they have] nothing to do with the alleged infringement").

9       While some of the conduct at issue may well be covered

10  by the litigation privilege, Guardian has provided sufficient

11  allegations of unprivileged conduct to survive dismissal.

12       D.   Failure to State a Claim

13            1.   Tortious Interference with Contract (Claim 9)

14       The elements of a claim for intentional interference

15  with contractual relations are "(1) a valid contract between

16  plaintiff and a third party; (2) defendant's knowledge of this

17  contract; (3) defendant's intentional acts designed to induce a

18  breach or disruption of the contractual relationship; (4) actual

19  breach or disruption of the contractual relationship; and (5)

20  resulting damage."  hiQ Labs, Inc. v. LinkedIn Corp., 31 F.4th

21  1180, 1191 (9th Cir. 2022) (quoting Pac. Gas & Elec. Co. v. Bear

22  Stearns & Co., 50 Cal. 3d 1118, 1126 (1990)).  "'[I]t is not

23  necessary that the defendant's conduct be wrongful apart from the

24  interference with the contract itself.'"  Salon Supply Store, LLC

25  v. Creative Nail Design, Inc., No. 14-cv-01083, 2015 WL 11438492,

26  at *8 (S.D. Cal. June 19, 2015) (quoting Quelimane Co. v. Stewart

27  Title Guar. Co., 19 Cal. 4th 26, 55 (1998)).

28       Defendants argue that they cannot be held liable for

tortious interference with contract because they acted with a
legitimate business purpose, namely protecting their patents.

"Under California law, a legitimate business purpose
can indeed justify interference with contract, but not just any
such purpose suffices." hiQ Labs, 31 F.4th at 1192 (citing
Quelimane, 19 Cal. 4th at 55-56). "Rather, interference with
contract is justified only when the party alleged to have
interfered acted 'to protect an interest that has greater social
value than [e]nsuring the stability of the contract' interfered
with." Id. at 1193 (quoting Imperial Ice Co. v. Rossier, 18 Cal.
2d 33, 35 (1941)). Accordingly, California courts determining
whether a business purpose justifies interference with contract
balance "'the importance, social and private, of the objective
advanced by the interference against the importance of the
interest interfered with, considering all circumstances including
the nature of the actor's conduct and the relationship between
the parties.'" Id. (quoting Herron v. State Farm Mut. Ins. Co.,
56 Cal. 2d 202, 206, (1961)). "Considerations include whether
the means of interference involve no more than recognized trade
practices, and whether the conduct is within the realm of fair
competition," but "[t]he determinative question is whether the
business interest is pretextual or asserted in good faith." Id.
(internal quotation marks and citations omitted).

Defendants state in conclusory fashion that patent
enforcement qualifies as a legitimate business purpose, but cite
no California authorities for that proposition, nor do they
engage with the applicable balancing test. More importantly,
there are allegations of bad faith in Miller Mendel's enforcement

21

1    of the patents, which indicates that the legitimate business

2    purpose defense may not apply.  See id. at 1193 ("The

3    determinative question is whether the business interest is

4    pretextual or asserted in good faith.").  Miller Mendel therefore

5    has not met its burden for establishing that this "affirmative

6    justification defense" applies.  See id. at 1192.  Accordingly,

7    Guardian's claim for tortious interference with contract will not

8    be dismissed based on the legitimate business purpose defense.

9          2.   Tortious Interference with Prospective Economic
                Advantage (Claim 10)
10

11         Tortious interference with prospective economic

12    advantage consists of "knowing[] interfere[nce]" with an

13    "economic relationship between the plaintiff and some third

14    party, which carries the probability of future economic benefit

15    to the plaintiff."  Ixchel Pharma, LLC v. Biogen, Inc., 9 Cal.

16    5th 1130, 1141 (2020) (cleaned up).  "Unlike intentional

17    interference with existing contractual relations, interference

18    with prospective economic advantage requires a plaintiff to

19    allege an act that is wrongful independent of the interference

20    itself."  CRST Van Expedited, Inc. v. Werner Enters., Inc., 479

21    F.3d 1099, 1108 (9th Cir. 2007) (citing Della Penna v. Toyota

22    Motor Sales, U.S.A., Inc., 11 Cal. 4th 376, 392-93 (1995)).

23         In addition to the "legitimate business purpose"

24    defense already rejected above, Miller Mendel argues that

25    Guardian fails to plead an independently wrongful act.  "[A]n act

26    is independently wrongful if it is unlawful, that is, if it is

27    proscribed by some constitutional, statutory, regulatory, common

28    law, or other determinable legal standard."  Id. (quoting Korea

                                    22

1   <u>Supply</u>, 29 Cal. 4th at 1159).  Here, Guardian has alleged

2   independently wrongful conduct, including the alleged false

3   statements made to its customers.  <u>See</u> <u>Visto Corp. v. Sproqit</u>

4   <u>Techs., Inc.</u>, 360 F. Supp. 2d 1064, 1067 (N.D. Cal. 2005)

5   (defendant pled "the element of independently wrongful conduct

6   because it has alleged that [the plaintiff]'s allegations of

7   patent infringement are false and/or defamatory").  Accordingly,

8   Guardian's claim for tortious interference with prospective

9   economic advantage will not be dismissed.

10          3.   <u>Unfair Competition and False Advertising</u> (Claims 7
              and 8)
11

12         The Unfair Competition Law ("UCL") prohibits any

13  unlawful, unfair, or fraudulent business act or practice.  Cal.

14  Bus. & Prof. Code § 17200.  The false advertising law makes it

15  unlawful to disseminate "untrue or misleading" statements with

16  the "intent . . . to dispose of real or personal property or

17  perform services."  Cal. Bus. & Prof. Code § 17500.

18         To have standing under both the UCL and false

19  advertising law, a plaintiff must: "(1) establish a loss or

20  deprivation of money or property sufficient to qualify as injury

21  in face, i.e., economic injury, and (2) show that that economic

22  injury was the result of, i.e., caused by, the unfair business

23  practice or false advertising that is the gravamen of the claim."

24  <u>Kwikset Corp. v. Superior Court</u>, 246 Cal. 4th 310, 332 (2011).

25          Guardian has successfully stated a claim under the UCL.

26  The UCL "borrows violations of other laws and treats them as

27  unlawful practices that the unfair competition law makes

28  independently actionable."  <u>Cel-Tech Commc'ns, Inc. v. Los</u>

1   <u>Angeles Cellular Tel. Co.</u>, 20 Cal. 4th 163, 180 (1999).  Because

2   Guardian has adequately pled the federal and state claims

3   discussed above, it has also adequately pled its UCL claim.  <u>See</u>

4   <u>Dairy, LLC v. Milk Moovement, Inc.</u>, No. 2:21-cv-02233 WBS AC,

5   2023 WL 3437426, at *15 (E.D. Cal. May 12, 2023).  Further,

6   Guardian has adequately pled economic injury in connection with

7   its underlying claims, for example, by explaining that Miller

8   Mendel's anticompetitive conduct enabled it to capture some of

9   Guardian's market share and customers, including at least one

10  customer who had already entered into a contract with Guardian.

11  (<u>See</u> Compl. ¶ 32.)  Accordingly, Guardian's UCL claim will not be

12  dismissed.

13          However, Guardian has failed to establish standing for

14  its false advertising claim.  While Guardian points to certain

15  allegedly false or misleading statements Miller Mendel made to

16  the public and to Guardian's customers (<u>see</u> Compl. ¶¶ 115-121),

17  it fails to provide allegations concerning the economic injury

18  caused by those statements specifically.  Accordingly, Guardian's

19  false advertising claim will be dismissed.

20          4.   <u>Trade Libel</u> (Claim 11)

21          Under California law, "[t]rade libel is the publication

22  of matter disparaging the quality of another's property, which

23  the publisher should recognize is likely to cause pecuniary loss

24  to the owner." <u>ComputerXpress, Inc. v. Jackson</u>, 93 Cal. App. 4th

25  993, 1010 (4th Dist. 2001) (citing <u>Leonardini v. Shell Oil Co.</u>,

26  216 Cal. App. 3d 547, 572 (3d Dist. 1989)).  It encompasses "all

27  false statements concerning the quality of services or product of

28  a business which are intended to cause that business financial

1    harm and in fact do so."  _Leonardini_, 216 Cal. App. 3d at 572.

2           To state a claim for trade libel, plaintiff must plead

3    special damages.  _Therabody_, 2024 WL 5316364, at *10 (collecting

4    cases).  Similarly to the false advertising claim, the trade

5    libel claim fails due to Guardian's failure to plead economic

6    damages in connection with the allegedly false statements at

7    issue, as opposed to damages caused by Miller Mendel's alleged

8    anticompetitive conduct as a whole.[9]  Accordingly, Guardian's

9    claim for trade libel will be dismissed.

10          IT IS THEREFORE ORDERED that defendants' motion to

11   strike (Docket No. 41) be, and the same hereby is, DENIED.

12          IT IS FURTHER ORDERED that defendants' motion to

13   dismiss (Docket No. 40) be, and the same hereby is, GRANTED only

14   as to the eighth claim for false advertising and eleventh claim

15   for trade libel.  The motion is DENIED in all other respects.

16   Plaintiff has **14 days** from the date of this Order to file an

17   amended complaint, if it can do so consistent with this Order.

18          Within **21 days** of the issuance of this Order, the

19   parties shall file a joint status report addressing (1) whether

20   this court should issue a pretrial scheduling order, and if so

21   what dates the parties desire and any other information required

22   under Federal Rule of Civil Procedure 26(f) (_see_ Docket No. 6);

23   _____

24          [9]    Guardian appears to recognize that its complaint fails
     to plead economic damages for purposes of the false advertising
     and trade libel claims, as it has provided a declaration
25   addressing this issue (_see_ Anthony Decl. (Docket No. 43)) and all
     but conceded the issue during oral argument.  However, the
26   declaration provided is not judicially noticeable and is
     therefore inappropriate for consideration at the pleadings stage.
27   _See_ Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 998 (9th
     Cir. 2018).
28

(2) whether the parties wish to proceed to settlement discussions, and if so whether they would like the court to refer the matter to the court's Voluntary Dispute Resolution Program ("VDRP") or a settlement conference with a magistrate judge; and (3) any other matter of which the parties think the court should be informed.

Dated:  April 30, 2025

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

26