**RYLANDER & ASSOCIATES PC**
KURT M. RYLANDER, admitted *pro hac vice*
E-Mail: rylander@rylanderlaw.com
P.O. Box 250
Vancouver, WA 98666
Telephone: 360.750-9931

**LEWIS BRISBOIS BISGAARD & SMITH LLP**
JOHN S. POULOS, CA State Bar No. 154689
E-Mail: John.Poulos@lewisbrisbois.com
CAITLIN E. HIGGINS, CA State Bar No. 298792
E-Mail: Caitlin.Higgins@lewisbrisbois.com
2485 Natomas Park Drive, Suite 450
Sacramento, California 95833
Telephone: 916.564.5400
Facsimile: 916.564.5444

LAWRENCE R. LAPORTE, CA State Bar No. 130003
E-Mail: Lawrence.LaPorte@lewisbrisbois.com
CHARLES KERTELL, CA State Bar No. 181214
E-Mail: Charles.Kertell@lewisbrisbois.com
633 West 5th Street, Suite 4000
Los Angeles, California 90071
Telephone: 213.250.1800
Facsimile: 213.250.7900

Attorneys for Defendants,
MILLER MENDEL, INC. and TYLER MILLER

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| GUARDIAN ALLIANCE TECHNOLOGIES, INC., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>MILLER MENDEL, INC., a Washington corporation; and TYLER MILLER, an individual,<br><br>Defendants. | Case No. 2:22-CV-01390-WBS-AC<br><br>**DEFENDANTS MILLER MENDEL AND TYLER MILLER'S CLAIM CONSTRUCTION BRIEF**<br><br>Hon. William B. Shubb |

# TABLE OF CONTENTS

**Page**

I. Introduction ....1
II. Overview Of The Patents-In-Suit....2
III. Canons Of Patent Claim Construction ....5
IV. The Person Having Ordinary Skill In The Art ....7
V. Plaintiff Has Never Disclosed Any "Ordinary Meaning" Constructions to Defendants....7
VI. Plaintiff Has Deviated Substantially From Constructions It Previously Advocated ....8
VII. "Reference" Group Of Claim Terms....10
VIII. "Hyperlink" Group Of Claim Terms....14
IX. "Applicant Entry" Group Of Claim Terms ....17
X. "Program Data" Group Of Claim Terms....19
XI. "Electronic Documents" Group Of Claim Terms ....22
XII. "Reference Class" Group Of Claim Terms ....25
XIII. "Questionnaire" Group Of Claim Terms....29
XIV. "Suggested Reference List" Group Of Claim Terms ....33

# TABLE OF AUTHORITIES


**Page(s)**

*A.O. Smith Corp. v. Bradford White Corp.*,
2022 U.S. App. LEXIS 21422 (Fed. Cir., Aug. 3, 2022) (unpublished) .... 6

*Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*,
811 F.3d 1334 (Fed. Cir. 2016) .... 12

*Aortic Innovations LLC v. Edwards Lifesciences Corp.*,
159 F.4th 1 (Fed. Cir. 2025) .... 14, 23

*Baxter Healthcare Corp. v. Mylan Laboratories Ltd.*,
346 F. Supp.3d 643 (D.N.J. 2016) .... 8

*Edwards Lifesciences LLC v. Cook Inc.*,
582 F.3d 1322 (Fed. Cir. 2009) .... 14

*ERBE Elektromedizin GmbH v. Canady Technology LLC*,
629 F.3d 1278 (Fed. Cir. 2010) .... 13

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) .... 15

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
933 F.3d 1345 (Fed. Cir. 2019) .... 6

*Kaneka Corp. v. Xiamen Kingdomway Group. Co.*,
790 F.3d 1298 (Fed. Cir. 2015) .... 7, 24

*Laryngeal Mask Co. v. Ambu A/S*,
618 F.3d 1367 (Fed. Cir. 2010) .... 25

*Littelfuse, Inc. v. Mersen USA EP Corp.*,
29 F.4th 1376 (Fed. Cir. 2022) .... 18

*O2 Micro International Ltd. v. Beyond Innovation Technology Co.*,
521 F.3d 1351 (Fed. Cir. 2008) .... 8

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2006) (*en banc*) .... 6, 11

*Regeneron Pharmaceuticals, Inc. v. Mylan Pharmaceuticals, Inc.*,
2023 U.S. Dist. LEXIS 240835 (N.D.W.Va., April 19, 2023) .... 8

*SimpleAir, Inc. v. Sony Ericsson Mobile Communications AB*,
820 F.3d 419 (Fed. Cir. 2016) .... 13

*The Medicines Co. v. Mylan, Inc.*,
853 F.3d 1296 (Fed. Cir. 2017) .... 35

*Trustees of Columbia University v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) .......... 6, 7, 11, 15, 17, 24

*UTTO Inc. v. Metrotech Corp.*,
119 F. 4th 984 (Fed. Cir. 2024) .......... 32

## I. Introduction

Plaintiff Guardian Alliance Technologies, Inc. ("Plaintiff") seeks to invalidate all claims in two patents owned by defendant Miller Mendel, Inc., namely U.S. Patent No. 9,070,098 ("the '098 patent") and U.S. Patent No. 10,043,188 ("the '188 patent").[1] Both patents disclose a web-based software system for efficient management and processing of pre-employment background investigations by, for example, allowing an organization (*e.g.*, a police department) to create and customize electronic documents (*e.g.*, questionnaires; agreements). These electronic documents can be made available/sent (*e.g.*, via a hyperlink; by email) to an applicant (*e.g.*, a prospective police officer; a prospective secretary) or to a reference identified by the applicant (*e.g.*, a past employer; a neighbor) for completion and return via the software system. In several embodiments, the investigation is expedited by system generation (subject to potential modification by the organization) of an applicant set of electronic documents tied to the specific position within the organization sought by the applicant (*e.g.*, one set of applicant documents for police officers; a different set for secretaries) and a reference set of electronic documents based on the class/type of reference (*e.g.*, one set of reference documents for past employers; a different set for neighbors).

But, critically, this is not a typical patent case – as Defendants are not accusing Plaintiff of infringement. This is instead a very rare case where Plaintiff has really filed suit, not with the goal of invalidating patent claims, but to seek antitrust damages (requiring clear/convincing proof that Defendants attempted to monopolize a market by committing <u>fraud</u> against the U.S. Patent Office during prosecution of these patents or by filing <u>sham</u> litigation for infringement of patent claims Defendants <u>knew at the time</u> were invalid, when claims presumed valid under 35 U.S.C. §282).

This posture explains Plaintiff's current approach to claim construction. Unlike prior Oklahoma district court litigation (where Plaintiff's customer was accused of infringement and universally sought extremely <u>narrow</u> constructions for all claim terms as part of a strategy to avoid infringement), Plaintiff (now free from such concerns) asserts every claim term should <u>broadly</u> be

---

[1] Defendant Tyler Miller is the sole named inventor of both patents, which share virtually identical specifications (the '188 patent issued from a continuation application) and were assigned the same Patent Examiner. Claims 1, 5, and 15 of the '188 patent are not at issue, as they were previously invalidated. Miller Mendel, Inc. and Mr. Miller are collectively referred to as "Defendants."

given its "plain and ordinary meaning" – constructions that (if adopted) Plaintiff will try to use to argue that prior art (art even Plaintiff would concede is irrelevant under any other construction) invalidates the claims and/or should have been disclosed to the Examiner during prosecution.[2] This wholesale abandonment of prior construction positions is not an attempt to "get it right."

Even more importantly, Plaintiff has never disclosed what it contends is the "plain and ordinary meaning" of each claim term (let alone in the context of these patents). In fact, Plaintiff has only made a blanket declaration that any/all claim terms Defendants might want to have construed should simply be given their "plain and ordinary meaning" (with no further guidance to the jury). This is a transparent and improper effort to have that lay jury (and not this Court) effectively decide the meaning of claim terms; and to delay those decisions until the antitrust trial. That would nullify the bifurcated schedule Plaintiff agreed to (with all patent issues resolved in Phase I) and complicate/prevent the early filing of summary judgment motions by Defendants.[3]

Defendants herein seek constructions of several terms appearing in the claims of the '098 and/or '188 patents according to established case law (which notably requires consideration of the specifications, the prosecution histories, and the language/context of the claims themselves).

## II. Overview Of The Patents-In-Suit

As mentioned above, the patent specifications disclose a web-based software system designed for efficient management/processing of pre-employment background investigations. Rylander Ex. 1, Abstract; Col. 3:60-65.[4] These efficiencies include, but are not limited to: (1) the

---

[2] Plaintiff ignores that Defendants would not have been aware of any such broad constructions during prior litigation. In fact, Defendants would have been aware of the extremely narrow constructions proposed by Plaintiff and/or Plaintiff's customers.

[3] Plaintiff has engaged in a pattern of delay. For example, Plaintiff has failed to serve Defendants with any responses (or objections) to entire sets of document requests and interrogatories – some due almost a year ago (and all due at least five months ago) – even after Defendants detailed these failures to participate in discovery in good faith in multiple letters and arranged a substantive "meet and confer." Tellingly, the interrogatories are largely directed at Plaintiff's claims of invalidity and inequitable conduct. Defendants will move to compel full and complete responses.

[4] Throughout this brief, citations to Exhibit 1 (the '098 patent) attached to the Declaration of Kurt Rylander (the "Rylander Decl.") – other than citations to the claims – are equally applicable to identical disclosures in Exhibit 2 (the '188 patent) and are intended to include those citations as well. The '188 patent citations have been omitted to avoid redundancy and to simplify the text.

ability of an organization to instantaneously cross-reference background investigations previously conducted on the same applicant, even by a completely different organization halfway around the world for an entirely different position; (2) the ability of an organization to create a specialized set of electronic documents for each different position in the organization that can be instantaneously made available to an applicant for that position, but that can be customized at the organization's discretion; (3) the ability of an organization to collect and store information from applicants and/or references in purely digital form; and (4) the ability of an organization to create questionnaires that, with no additional action by the organization after the questionnaire is made available to the applicant or reference, allow the use and/or content of a question presented to the applicant or reference to depend on their response to one or more prior questions in the same questionnaire.

In at least one embodiment, an applicant applies for a position within an organization (*e.g.*, an individual applies to become a police officer with the Sacramento police department) – and is selected for a background check. Rylander Ex. 1, Col. 14:23-33. The organization then creates an applicant entry in the background check software system (a software system used by multiple organizations that electronically shares information between those organizations). The applicant entry represents a system record associated with the applicant for the position with the organization, and for whom the check will be performed. *Id.* at Col. 14:34-43; Col. 6:58-64.

The system then initially performs an internal check to determine if the applicant already has another applicant entry from a different organization, or from an earlier background check with the same organization. In other words, the system can determine if the applicant previously applied for a position with a different organization (*e.g.*, the New York police department), or even the same organization. This initial check enables the system to notify the organization (*e.g.*, the Sacramento police department) early – in case there were some issues with the applicant that were found during a prior background investigation (thus potentially obviating the need to perform another background investigation). *Id*. at Col. 14:56-55; Col. 4:11-23; Col. 6:64-7:5.

In an illustrative embodiment, the applicant entry is also associated with a particular position (*e.g.*, police officer) within the organization. Because each position may have its own requirements and background criteria that should be investigated (*e.g.*, a background check for a

police officer may look at different issues than a check for a confidential secretary), each position has an associated set of pre-defined electronic documents relevant to that position – including at least one questionnaire that has been pre-prepared with questions relevant to that position. *Id.* at Col. 14:56-67; Col. 4:11-23; Col. 7:44-56. This allows for expedited assignment of that set of electronic documents (*e.g.*, questionnaires; agreements; advisements) for that position to the applicant by simply assigning the position name to the newly entered applicant, as opposed to having to select each individual document for the applicant to complete. *Id.* at Col. 7:44-56.

However, the organization (via its investigator) can optionally select additional documents for the applicant to fill out, or to deselect one or more of the pre-selected documents, or to even accept the set of pre-selected documents. *Id.* at Col. 14:56-67. The organization can also build questionnaires and choose various styles of answers an applicant (or a reference) can provide in response to a question. For instance, if an applicant answers a certain way (*e.g.*, they answer "yes" to a yes or no question), the form builder can be set to ask additional sub-questions based on the applicant's response. This eliminates the need for the applicant to see multiple questions that may not apply to their situation due to the applicant's previous response. *Id.* at Col. 5:55-6:9.

Once the operative set of documents is selected by the organization, it causes those documents to be made available to the applicant. As one option, an e-mail transmission is sent to the applicant with an electronic invitation (such as an electronic link back) to return and login to the system – and electronically "fill out" the documents online. This option results in greater efficiency (*e.g.*, over an alternative where printable .pdf documents are sent to the applicant by email) in that hardcopy documents may be eliminated, and the applicant's information may be entered into the system only once (*e.g.*, eliminating human error and improving computer functioning by obviating the need for optical character recognition). *Id.* at Col. 15:1-18.

When the applicant responds to the invitation (*e.g.*, logs onto the software system), the applicant is prompted to answer the questions in each questionnaire. These may include requests to identify individuals and/or entities as references. *Id.* at Col. 15:19-25.

The novel system in the illustrative embodiment uses the names, email addresses, etc. an applicant supplies from the questionnaires to build a reference file – where the system displays

reference sources (*e.g.*, relatives; employers; former employers; co-workers; neighbors; creditors). The system also allows generation of a set of pre-selected electronic documents (that may include questionnaires, agreements, and/or advisements) related to that class of reference (*e.g.*, relatives; employers; former employers; co-workers; neighbors; creditors) – that can then be modified by the investigator. The system also preferably transmits an invitation to the reference to view/complete questionnaires in that set of electronic documents the organization has selected them to see and complete. For example, the reference may receive an email with a link to log into the software system to access and complete those reference documents. *Id.* at Col. 15:25-32; Col. 8:16-40.

The system may also contain a feature that can retrieve law enforcement and/or court names, addresses, and phone numbers for a pre-defined radius around the applicant's current address, past addresses, and/or those addresses of the applicant's employer's and/or relatives. The system does this by taking the address information the applicant provided on questionnaires they submitted to the organization via the system. The system (not the investigator) then conducts a search using an Internet search engine for agencies and/or courts around the selected address. A list of agencies and/or courts is then presented to the organization – at which time the organization selects the agencies/courts to which it will send reference letters. *Id.* at Col. 9:46-60.

Once the required amount of information has been provided by those that have been invited to respond (applicant and any references), the system may initiate an alarm to inform the organization of that fact – ensuring the organization has any information necessary for the background investigation in one, easily accessible location. *Id.* at Col. 15:36-45.

## III. Canons Of Patent Claim Construction

Claim construction requires a determination as to how a person having ordinary skill in the art (a "PHOSITA") at the time of the invention (usually credited as the effective filing date of the patent), not a lay juror at trial, would understand a claim term <u>in the context of the entire patent</u>.[5]

---

[5] This is because, in part, inventors are often a PHOSITA and patents are addressed to/intended to be read by a PHOSITA. The effective filing date of the patents-in-suit is April 6, 2011 (the filing date of U.S. Provisional Application No. 61/472,556, to which both claim priority). While Plaintiff has disagreed about the priority claim of the '188 patent, a Certification of Correction was issued in 2020 that makes express the priority claim to the '556 application. Rylander Ex. 2.

A court begins its construction analysis by considering the language of the claims themselves (including the context in which a term is used in the asserted claim and any use of the same term in other claims). However, claims must be read in view of the specification, of which they are a part. The specification is the "single best guide" to the meaning of a disputed term; and it is thus the primary basis for construing the claims. A court should also consider the patent's prosecution history. *See, e.g.*, *Trustees of Columbia University v. Symantec Corp.*, 811 F.3d 1359, 1362-63 (Fed. Cir. 2016); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-17 (Fed. Cir. 2006) (*en banc*).

Consistent with this flexible approach, the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess; and in such cases that lexigraphy governs (the patentee can act as his/her own lexicographer). *Phillips*, 415 F.3d at 1316. Explicit or express redefinition or disavowal (although sufficient) is <u>not</u> required – as the specification may define claim terms by implication such that the meaning may be found or ascertained by a reading of the patent documents. *Columbia*, 811 F.3d at 1363. For example, the patentee's choice of preferred embodiments and/or stated scope of the invention can shed light on intended claim scope. *Id.* at 1364. A patentee may also disavow or otherwise relinquish claim scope in the prosecution history. *Columbia*, 811 F.3d at 1363. Indeed, any explanation, elaboration, or qualification presented during examination is relevant, for the role of construction is to capture the scope of the actual invention disclosed, described, and patented. *See, e.g.*, *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1352-53 (Fed. Cir. 2019).

In appropriate circumstances, courts may also rely on extrinsic evidence (*i.e.*, evidence external to the patent and prosecution history, including expert and inventor testimony). *Phillips*, 415 F.3d at 1317. But, the Federal Circuit has repeatedly forbidden the use of extrinsic dictionary definitions as a primary source of a claim construction. For example, a court cannot merely consult the intrinsic evidence <u>after</u> a decision has been made as to ordinary meaning (based on a dictionary or treatise). *Columbia*, 811 F.3d at 1363; *Phillips*, 415 F.3d at 1320. *See also*, *A.O. Smith Corp. v. Bradford White Corp.*, 2022 U.S. App. LEXIS 21422 at *8 (Fed. Cir. Aug. 3, 2022) (unpublished) (rejecting approach where dictionary definition adopted, provided there was no redefinition or disavowal in the specification). Nor can a dictionary contradict a definition found

in or ascertained by a reading of the patent documents (*e.g.*, there is no reason to resort to extrinsic evidence if the intrinsic evidence is clear). *See, e.g.*, *Kaneka Corp. v. Xiamen Kingdomway Group. Co.*, 790 F.3d 1298, 1304-05 (Fed. Cir. 2015) (emphasis included). The only meaning that matters in claim construction is the meaning in the context of the patent. *Columbia*, 811 F.3d at 1365. Defendants have adopted this approach to claim construction for this case.

**IV. The Person Having Ordinary Skill In The Art**

A PHOSITA (as of April 6, 2011) would have a Bachelor of Science degree in computer science or computer engineering (or equivalent education and training) and approximately two years of practical programming experience involving network services and web-based software. *See* the Declaration of David Howell, filed herewith (the "Howell Decl."), ¶¶33-35. Several of Defendants' proposed constructions are confirmed, at least in part, by expert testimony provided Mr. Howell – who unquestionably qualifies as a PHOSITA under the above definition. *Id.* at ¶36. Mr. Howell's experience actually far exceeds those minimum qualifications. *Id.* at ¶¶3-15, 36. In stark contrast, Plaintiff failed to submit any expert testimony by the deadline for disclosure of extrinsic evidence. As such, Mr. Howell's testimony stands unrebutted by any other PHOSITA.[6]

**V. Plaintiff Has Never Disclosed Any "Ordinary Meaning" Constructions To Defendants**

Plaintiff has never identified any claim terms it believes require construction. And, for those terms identified by Defendants, Plaintiff only states that, to the extent the Court decides any of those terms should be construed, they should be afforded their "plain and ordinary meaning." Rylander Ex. 8. Importantly, Plaintiff never disclosed any such "plain and ordinary meanings" to Defendants (it has adopted a generic, blanket position for all proposed terms). Nor did Plaintiff disclose any intrinsic support (*e.g.*, cites to the specification, claims, and/or prosecution history).[7] While Courts are split on whether a litigant must always provide a proposed "plain and ordinary

---

[6] The parties stipulated the exchange of extrinsic evidence would contain at least the same information, testimony, and descriptions required under Northern District of California Local Patent Rule 4-2(b). Dkt. 93, p. 8, n. 4. That stipulation, when read in conjunction with this Court's Scheduling Order (Dkt. 94), required all extrinsic evidence – including a description of the substance of any proposed witness testimony – be exchanged by May 28, 2026.

[7] The parties' stipulation and the Court's Order also required disclosure of intrinsic support for tentative claim constructions by May 21, 2026. Dkts. 93, 94.

meaning" for each term, Plaintiff's tactical decision should bar it from offering any such meanings at this time (as Defendants were deprived of notice and discovery). The constructions offered by Defendants (supported by the intrinsic record and unrebutted expert testimony) should be adopted. *See, e.g., Regeneron Pharm., Inc. v. Mylan Pharm., Inc.*, 2023 U.S. Dist. LEXIS 240835 at *7-11 (N.D.W.Va., April 19, 2023) (while parties agreed term should be given its "plain and ordinary meaning," defendant provided a proposed plain meaning and plaintiff did not; court concluded the disputed term could not be construed simply by reference, without explanation, to the "plain and ordinary meaning" and that plaintiff could not avoid defining the term by merely asserting it has a plain meaning; court adopted defendant's proposed plain and ordinary meaning because it was unrebutted and supported by the intrinsic record); *Baxter Healthcare Corp. v. Mylan Laboratories Ltd.*, 346 F. Supp.3d 643, 653 (D.N.J. 2016); D.N.J Patent Local Rule 4.2 (requiring disclosure of proposed "plain and ordinary meanings"). Indeed, because Plaintiff made an intentional and calculated decision to avoid disclosing any proposed "plain and ordinary meanings" it is virtually impossible to know (unless the Court adopts Defendants' proposed constructions) whether there are any fundamental disputes between the parties regarding the scope of any particular claim term <u>in the context of these patents</u> – <u>disputes the Court has an affirmative duty to resolve</u>. *See, e.g., O2 Micro International Ltd. v. Beyond Innovation Technology Co.*, 521 F.3d 1351, 1361-62 (Fed. Cir. 2008) (a determination that a claim term has its "plain and ordinary meaning" may be inadequate if the term has more than one "ordinary" meaning or when reliance on a term's "ordinary" meaning does not resolve the parties' dispute; district courts are not required to construe every limitation present in the asserted claims, but "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it").

## VI. Plaintiff Has Deviated Substantially From Constructions It Previously Advocated

The parties previously proposed constructions for several claim terms in connection with: (1) Plaintiff's unsuccessful 2019 *Inter Parties* Review ("IPR") Petition that sought to invalidate certain claims; and (2) a prior district court action in Oklahoma (during 2021).[8] Rylander Exs. 6-

[8] Neither the TTAB nor the district court issued a claim construction opinion. While the Oklahoma (footnote continued)

7. While litigants (and courts) are certainly entitled to alter their construction positions over time, Plaintiff's substantial changes (between then and now) must be viewed as purely opportunistic.[9]

Again, Plaintiff's motivation for wholesale change is obvious. While Plaintiff wanted the patent claims to be construed very narrowly in Oklahoma (in an attempt to avoid infringement), Plaintiff now wants them broadly construed (in an attempt to invalidate them – as it is easier to invalidate broad claims than narrow claims; and, more importantly, in an attempt to argue that, with these new/broad "plain and ordinary meaning" constructions, Defendants previously filed suit on invalid claims). However, a *Handgards* antitrust claim requires (among other things) that Defendants knew the claims were invalid <u>at the time of the suit</u>. Thus, even ignoring that issued claims are presumed valid, Plaintiff apparently seeks antitrust damages on a theory that requires proof that Defendants always knew Plaintiff's own prior, narrow constructions <u>had to be wrong</u>.

Three examples of tactical changes by Plaintiff are illustrative. First, while now asserting the claim language "reference class" should be given its "plain and ordinary meaning," Plaintiff (in its IPR Petition) expressly stated it should <u>not</u> be accorded such meaning.[10] Rylander Ex. 6, pp. 13-15. Moreover, while now refusing any detail based on the specification and claims in any construction, Plaintiff argued (in Oklahoma) that "reference class" specifically means "a type or category of reference source grouped by a common characteristic distinguishing the reference source from other reference sources, such as a relative, former employer, or creditor." Plaintiff

---

filing was technically submitted by Plaintiff's client (The City of Oklahoma City) Plaintiff was a co-defendant. Plaintiff also directed and funded its client's defense (with both represented by the same counsel, also representing Plaintiff here). Nor did Plaintiff voice objection to its client's constructions. Any argument they were not Plaintiff constructions is thus nonsensical.

[9] Defendants offer <u>some</u> constructions that may differ from those proposed in Oklahoma. But, none constitute a reversal of position for tactical advantage. Defendants now offer their constructions after additional study of the specifications, the claims, the prosecution histories, and the relevant case law – to more closely adhere to the intrinsic evidence (*e.g.*, "hyperlink") and/or to offer more clarity to a lay juror (*e.g.*, "applicant entry"). Defendants have also been forced to seek constructions for certain terms (*e.g.*, "program data;" "inter-active questionnaire") where they did not previously seek a construction due to Plaintiff's new and expansive (but also ambiguous) invalidity contentions under 35 U.S.C. §112 (*e.g.*, alleged indefiniteness and non-enablement).

[10] Plaintiff repeats this same pattern (reversing it prior arguments to the U.S. Patent Office that a "plain and ordinary meaning" was <u>not</u> applicable) in connection with several other claim terms – including "reference source" and "program data." Rylander Ex. 6, pp. 13-15.

also defended its inclusion of specific examples of different reference classes by arguing they appeared in the specification and allegedly made its construction "clear, unambiguous, and consistent with the intrinsic evidence." Rylander Ex. 7, pp. 16-17. Plaintiff's refusal to disclose its proposed "plain and ordinary meaning" almost certainly belies an intent to argue, at trial, a construction that bears no resemblance to what it previously advocated.

Second, while now asserting "applicant entry" should be accorded its "plain and ordinary meaning" (without disclosing that proposed meaning in the context of the patents), Plaintiff argued in Oklahoma that the term meant "a system record associated with the applicant for the position within the organization and for whom the background check will be performed" – a direct quote from the specifications. Thus, while Plaintiff effectively agreed the patentee had acted as his own lexicographer (*i.e.*, that the specifications and claims, at least implicitly, defined the term), Plaintiff now takes a diametrically opposite position without explanation. Ryland Ex. 7, pp. 8-10.

Third, while now asserting "suggested reference list" should be accorded its "plain and ordinary meaning" (again without disclosing that proposed meaning in the context of these patents), Plaintiff argued in Oklahoma that this term meant "a list of one or more recommended law enforcement agencies presented to the user" – and complained Defendants' construction was "overly broad and <u>ignore[d] the context of the claims in which the term appears</u>." Rylander Ex. 7, pp. 21-22 (emphasis added). Other similar examples abound (Plaintiff even ridiculously asserted in Oklahoma that "organization" should only mean a "law enforcement agency" (*i.e.*, that the claims are exclusively limited to background checks for law enforcement agencies). *Id.* at p. 7. Nobody attempting to arrive at proper claim constructions can honestly believe the claims are strictly limited to law enforcement agencies one day, and then on another day assert that a lay jury should be provided with no guidance other than the words "plain and ordinary meaning."

**VII. "Reference" Group Of Claim Terms**

| reference | a person (including a person acting on behalf of an entity) invited to provide information regarding an applicant |
|---|---|
| • '098 Patent: Claims 1, 4, 5, 8, 9, 12, 13<br>• '188 Patent: Claims 4, 8, 9, 12, 13<br>Note: Previously invalidated claims excluded from this and all other lists. | |

A PHOSITA in April 2011 would have understood "reference" (as used in the claims of the patents-in-suit) means "a person (including a person acting on behalf of an entity) invited to provide information regarding an applicant." Howell Decl., ¶¶55-56. This construction is fully supported by the specifications. Rylander Ex. 1, Col. 8:16-62 (relatives, employers, supervisors, co-workers, and neighbors disclosed as examples); Col. 15:19-42 (former employers and creditors disclosed as additional examples); Figs. 4, 26 (neighbors, housemates, and landlords disclosed as further examples). *See, e.g.*, *Columbia*, 811 F.3d at 1362-63 (the specification is the single best guide to the meaning of a disputed term). This construction is further confirmed by context provided by the 12 above-identified claims (*e.g.*, "receiving an applicant electronic response with program data regarding a first reference, wherein the first reference is a first person likely to have information regarding the applicant, the program data including a first reference email address associated with the first reference;" "transmitting a first reference hyperlink to the first reference email address, the first reference hyperlink for viewing the first reference set of electronic documents associated with the position;" "receiving a first reference electronic response to the first reference set of electronic documents from the first reference"). Rylander Exs. 1-2. *See, e.g.*, *Phillips*, 415 F.3d at 1314 (the claims themselves provide substantial guidance as to the meaning of particular terms). The patentee also expressly stated to the Examiner on multiple occasions during prosecution of both patents that a "reference" is a <u>person</u> – not information, a document, or an opinion given by that person. Rylander Ex. 3, p. 128 (Proposed Amendments attached to the May 15, 2014 Interview Summary), p. 113 (the June 10, 2014 Amendment/Reply); Rylander Ex. 4, p. 145 (the October 23, 2017 Reply/Amendment). *See, e.g.*, *Phillips*, 415 F.3d at 1317 (the prosecution history can often inform the meaning of claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be).

Plaintiff has never disclosed its proposed "plain and ordinary meaning" in the context of the patents. Defendants thus have no notice as to whether a dispute exists between the parties, or what differences (if any) exist between their proposed constructions. Moreover, in Oklahoma, Plaintiff argued that "reference source" (which, as detailed below, means the same as "reference")

should not be simply construed as "plain and ordinary meaning" – but should instead be defined to mean "a person, such as a relative, employer, supervisor, co-worker, neighbor, personal reference, or a law enforcement agency, invited to provide reference information about the applicant." Rylander Ex. 7, pp. 15-16. But, even this proposed Oklahoma construction (among other things) never explains what Plaintiff intended "reference information" to include or exclude (or why a "reference information" limitation was needed). It also improperly suggests references are limited to those types expressly disclosed (or, at least, those similar thereto).[11] Nevertheless, Plaintiff's Oklahoma position establishes that it contended (at that time) a "reference" can be a natural person (*e.g.*, a relative) or a legal person/entity (*e.g.*, "a law enforcement agency").[12]

| first reference | same as "reference" |
|---|---|
| • '098 Patent: Claims 1, 5, 9, 13 | |

"First reference" appears in four claims of the '098 patent; and a PHOSITA would have understood it has the same meaning as "reference." Howell Decl., ¶¶55-56. A review of the prosecution history is instructive. "First reference" was added to three proposed independent claims in the January 6, 2014 Amendment/Reply. Rylander Ex. 3, pp. 159-67 (proposed claims 3, 8, and 13 – claims that eventually issued after amendment as claims 1, 5, and 9). The word "first" was merely used (at that time) as an ordinal designation to differentiate the "reference" mentioned in those independent claims from a different (*i.e.*, "second") "reference" mentioned in several proposed dependent claims (proposed claims 5, 10, and 15).[13] *Id*. However, those dependent

---

[11] In its 2019 IPR Petition, Plaintiff also argued "reference source" should not be accorded its "plain and ordinary meaning." Plaintiff instead agreed it should mean "a person invited to give reference information regarding the applicant." Rylander Ex. 6, pp. 13-15 (again never explaining what "reference information" includes or excludes, or why the "reference" limitation was needed).

[12] Plaintiff might suggest "reference" is more narrowly a person "likely to have information regarding the applicant." *See, e.g.*, Rylander Ex. 3, p. 49 (the December 9, 2014 Amendment/ Reply). However, that would render the same language (appearing in claims 1, 5, and 9 of the '098 patent, as well as claim 9 of the '188 patent) superfluous. *See, e.g.*, *Akzo Nobel Coatings, Inc. v. Dow Chemical Co.*, 811 F.3d 1334, 1340 (Fed. Cir. 2016) (interpretations that render some portion of the claim language superfluous are disfavored).

[13] "First" was also used for the same reason in the June 10, 2014 Amendment/Reply. Rylander (footnote continued)

claims were: (1) later amended to eliminate any mention of a "second reference" (in the December 9, 2014 Amendment/Reply); and (2) ultimately cancelled in their entirety (in the April 7, 2015 Notice of Allowability). Rylander Ex. 3, pp. 14-24, 40-56. However, the term "first" in the three independent claims (as well as the term "first" in issued claim 13) were never deleted – and thus the word "first" became a vestigial artifact signifying nothing (as no "second reference" appears in the issued claims).[14] *See, e.g.*, *SimpleAir, Inc. v. Sony Ericsson Mobile Communications AB*, 820 F.3d 419, 429 (Fed. Cir. 2016) (the preference for giving meaning to all claim terms not an inflexible rule superseding all other principles of claim construction); *ERBE Elektromedizin GmbH v. Canady Technology LLC*, 629 F.3d 1278, 286 (Fed. Cir. 2010) (surplus terms may exist).

| reference source | same as "reference" |
|---|---|
| • '188 Patent: Claims 4, 8, 9, 12, 13 | |

The patentee used slightly different claim language during prosecution of the '188 patent (using "reference source" instead of "reference" or "first reference"). However, a PHOSITA in April 2011 would have understood "reference source" has the same meaning as "reference." Howell Decl., ¶¶55-56. This is again confirmed by the prosecution history. In the application that matured into the '188 patent (filed on May 26, 2015), the original proposed claims (like the claims of the '098 patent that would soon issue) used "first reference." Rylander Ex. 4, pp. 344-431 (proposed claims 1, 5, 9, 13). Almost two years later, "first reference" was universally changed to "reference" (*i.e.*, as discussed above in connection with the '098 patent, there was no need for the ordinal term "first" when no "second reference" is claimed).[15] Rylander Ex. 4, pp. 181-193 (the

Ex. 3, pp. 106-118 (newly added proposed dependent claim 18, which would issue in amended form as claim 13, repeats the "first reference" mentioned in its corresponding independent claim).

[14] Further, the Examiner plainly knew "reference" and "first reference" were synonymous. In fact, he issued a Notice of Allowability (and edited the claims therein), even though claims 4, 8, and 12 of the '098 patent (which are dependent on claims 1, 5, and 9, respectively) refer to "the reference" (and not "the first reference"). Rylander Ex. 3, pp. 14-24.

[15] That the term "first" is a meaningless vestigial artifact, and that its deletion from the claims had no substantive impact, was confirmed by the lack of any accompanying explanatory remarks by the patentee (or questions from the Examiner).

May 1, 2017 Amendment/ Reply). Then, in an October 23, 2017 Reply/Amendment, the term "reference" was repeatedly changed to "reference source" – but not for any substantive reason. Rylander Ex. 4, pp. 137-48. Instead, as specifically explained in the accompanying remarks (remarks that echo similar statements made during the earlier prosecution of the '098 patent), the change was made (given prior rejections by the Examiner) to better clarify that a "reference" is a person (and not information or an opinion offered by that person).[16] *Id.*

**VIII. "Hyperlink" Group Of Claim Terms**

| | |
|---|---|
| hyperlink | a reference to data that the reader can directly follow either by clicking or by hovering or that is followed automatically, which may be visually presented as a button or as text |
| • '098 Patent: Claims 1, 3, 5, 7, 9, 11<br>• '188 Patent: Claims 3, 7, 9, 11 | |

A PHOSITA in April 2011 would have understood "hyperlink" (as used in the claims of the patents-in-suit) means "a reference to data that the reader can directly follow either by clicking or by hovering or that is followed automatically, which may be visually presented as a button or as text." Howell Decl., ¶53; Howell Decl., Ex. E.

The prosecution history of the '098 patent is again instructive. Indeed it is dispositive. "Hyperlink" was first added to the claims in a December 9, 2014 Amendment/Reply. Rylander Ex. 3, pp. 40-56 (adding "hyperlink" and amending "link" to "hyperlink"). As the patentee expressly stated in the accompanying remarks, "link" was amended to "hyperlink" to differentiate between the two ways the word "link" is used in the '098 patent specification. The patentee did not mean a "communications link." *Id.* at p. 49 (*e.g.*, a link between computing devices via communication ports). *See also*, Rylander Ex. 1, Col. 13:47-14:12; Fig. 62. Instead, "hyperlink" was thereafter used in the claims to ensure it was understood the patentee meant "a reference to

[16] "Reference" and "reference source" are also used interchangeably throughout the specifications. *See, e.g.*, Rylander Ex. 2, Col. 8:18-65; Figs. 4, 26 (two figures that use "reference" and "reference source" interchangeably). *See, e.g.*, *Aortic Innovations LLC v. Edwards Lifesciences Corp.*, 159 F.4th 1, 8-9 (Fed. Cir. 2025) (a patent's interchangeable use of two terms can result in a definition equating two terms); *Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1329-30 (Fed. Cir. 2009) (the interchangeable use of two terms is akin to a definition equating the two; claim differentiation does not require that two terms used in different claims be read differently).

data that the reader can directly follow either by clicking or by hovering or that is followed automatically" (also expressly stating the hyperlink "may be visually presented as a button or as text").[17] Rylander Ex. 3, p. 49. *See also*, Rylander Ex. 1, Col. 2:26-28; Col. 3:41-44; Col. 5:20-28; Col. 6:29-33; Col. 8:29-37; Col. 10:50-67; Col. 15:1-4; Col. 15:8-14. This express statement from the prosecution history is further confirmed by the context provided in the above-identified claims (*e.g.*, "transmitting an applicant hyperlink to an applicant email address….the applicant hyperlink for viewing an applicant set of electronic documents;" "transmitting a first reference hyperlink to the first reference email address, the first reference hyperlink for viewing the first reference set of electronic documents…"). Rylander Exs. 1-2.

Plaintiff has never disclosed its proposed "plain and ordinary meaning" of "hyperlink;" nor explained why the prosecution history is not controlling.[18] Instead, it appears Plaintiff intends to rely (perhaps exclusively) on dictionary definitions without <u>first</u> considering if the intrinsic record (*e.g.*, if it is clear) and/or without evaluating if the dictionary contradicts any definition found in or ascertained by a reading of the patent documents. *See, e.g.*, *Columbia*, 811 F.3d at 1363.

| applicant hyperlink | a hyperlink delivered to the applicant |
|---|---|
| • '098 Patent: Claims 1, 3, 5, 7, 9, 11<br>• '188 Patent: Claims 3, 7, 9, 11 | |

The meaning of "applicant hyperlink" should also be undisputed – as it is clear from the specifications and claims. As recited in all independent claims (in both patents), the "applicant hyperlink" is transmitted to "an <u>applicant</u> email address associated with the <u>applicant</u>;" and the "applicant hyperlink" is "for viewing an <u>applicant</u> set of electronic documents." Rylander Exs. 1-2 (emphasis added). *See also*, Rylander Ex. 1, Col. 15:1-4, Col. 15:8-14 ("an e-mail transmission is sent to the applicant with an electronic invitation (such as an electronic link back) to return and

[17] The claims of the '188 patent use "hyperlink" in the same way. *See, e.g.*, *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1371 (Fed. Cir. 2014) (when multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any issued patent applies with equal force to subsequently issued patents that contain the same limitation).

[18] In its IPR Petition, Plaintiff asserted "hyperlink" should <u>not</u> be accorded its "plain and ordinary meaning." Rylander Ex. 6, pp. 13-18. Plaintiff also ignored the patentee's statements from the prosecution history when proposing constructions in Oklahoma. Rylander Ex. 7, pp. 13-14.

login to the system and electronically 'fill out' the documents online"). An "applicant hyperlink" is thus "a hyperlink delivered to the applicant."[19]

| reference hyperlink | a hyperlink delivered to the reference/reference source |
|---|---|
| • '188 Patent: Claim 9 | |

Nor should the meaning of "reference hyperlink" be disputed – as it is again clear from the '188 patent specification and claims. The "reference hyperlink" (in all independent claims) is transmitted "to the reference email address" associated with the reference source; and the "reference hyperlink" is "for viewing the reference set of electronic documents." Rylander Ex. 2 (emphasis added). *See also*, Rylander Ex. 2, Col. 8:31-39 ("If an email address was provided for a reference source, the organization's user can select how to mail the reference documents to the individual (by email, or by mail, or by both)….If by email, the reference receives an email with a link to log into the software system….Here the reference is presented with the documents the organization has selected them to see and complete"). A "reference hyperlink" is thus "a hyperlink delivered to the reference/reference source" (by electronic transmission).

| first reference hyperlink | a hyperlink delivered to the reference/first reference[20] |
|---|---|
| • '098 Patent: Claims 1, 5, 9 | |

The same is true of "first reference hyperlink" in the '098 patent – which is synonymous with "reference hyperlink" in the '188 patent (although it refers to a hyperlink delivered to the reference/first reference). As detailed above in Section VII, "first reference" (as used in the claims of the '098 patent) is identical in meaning to "reference source" (as used in the clams of the '188 patent) and "reference" – as there is no "second reference" mentioned in any issued claims. Moreover, as set forth in all independent claims of the '098 patent, the "first reference hyperlink" is transmitted to the email address of the first reference; and the "reference hyperlink" is "for

[19] It is also readily apparent from the patent claims that the delivery of all hyperlinks (applicant hyperlinks, reference hyperlinks, and first reference hyperlinks) is by electronic transmission.

[20] Defendants' initial/tentative proposed construction was "same as 'reference hyperlink.'" This has been re-phrased (for clarity) because the '098 patent claims use the terms "reference" and "first reference" (and not "reference source") – even though these terms all mean the same thing.

viewing the first reference set of electronic documents…" Rylander Ex. 1 (emphasis added). *See also*, Rylander Ex. 1, Col. 8:29-39 (same language quoted from Rylander Ex. 2, Col. 8:31-39).

**IX. "Applicant Entry" Group Of Claim Terms**

| applicant entry | a system record associated with an applicant for a position with an organization, and the organization for whom the background check is intended to be performed |
|---|---|
| • '098 Patent: Claims 1, 2, 5, 6, 9, 10<br>• '188 Patent: Claims 9, 10 | |

The specifications state the "applicant entry represents a system record associated with the applicant for the position with the organization, and for whom the background check will be performed." Rylander Ex. 1, Col. 14:39-42. The patentee thus acted as his own lexicographer. *See, e.g.*, *Columbia*, 811 F.3d at 1363 (patentee can act as his own lexicographer; the specification may define terms by implication through a reading of the patent documents).

However, Defendants propose two clarifications. First, because the above-cited passage from the specifications might be inaccurately understood by a lay juror to require that the background investigation be completed ("…for whom the background check will be performed") (emphasis added), Defendants' proposed construction provides that the organization only need intend for the background check to be performed. In fact, the specifications expressly describe an embodiment where, after the applicant entry is created, the system initially performs an internal check to determine if the applicant already has another applicant entry from a different organization, or perhaps from an earlier background check with the same organization, which may obviate the need to perform another background investigation (*i.e.*, the specification confirms an applicant entry can be created even if the intended background check is never performed).[21] Rylander Ex. 1, Col. 14:44-55; Col. 4:11-23; Col. 6:64-7:5; Fig. 63.

Second, because the above-cited passage might also be inaccurately understood by a lay juror to mean the referenced "system record" is only be associated with the applicant, Defendants'

[21] Plaintiff admitted in the Oklahoma action that "a PHOSITA would have understood that an 'applicant entry' may be created, and referred to as such, even when an organization fails to perform a background check." Rylander Ex. 7, p. 10. Plaintiff has thus previously conceded that Defendants' first clarification is technically proper.

proposed construction more clearly provides that the system record is also associated with the organization for whom the background check is intended to be performed. *See*, claims 2, 5, and 10 of the ‘098 and ‘188 patents (all reciting “searching for a previous applicant entry in the system memory associated with the applicant and a second organization….). Rylander Exs. 1-2. *See also*, *Littelfuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) (if dependent claim reads on an embodiment, so must the corresponding independent claim).

Given the above, a PHOSITA in April 2011 would have understood “applicant entry” (as used in the claims of the patents-in-suit) means “a system record associated with an applicant for a position with an organization, and the organization for whom the background check is intended to be performed.” Howell Decl., ¶¶42-44. *See also*, Howell Decl., Ex. B.

In conformance with its tactical approach, Plaintiff has again failed to disclose its proposed “plain and ordinary meaning.” More importantly, Plaintiff conceded in Oklahoma the patentee had acted as his own lexicographer – arguing “applicant entry” means “a system record associated with the applicant for the position with the organization, and for whom the background check will be performed” (the above-quoted specification language, verbatim). Plaintiff provides no legitimate reason (or any support) for its unexplained reversal. Rylander Ex. 7, pp. 8-10.

| new applicant entry | an applicant entry that has not previously been stored in the system memory |
|---|---|
| • ‘098 Patent: Claims 1, 5, 9<br>• ‘188 Patent: Claim 9 | |
| previous applicant entry | an applicant entry previously stored in the system memory |
| • ‘098 Patent: Claims 2, 6, 10<br>• ‘188 Patent: Claims 2, 6, 10 | |

Defendants present unrebutted expert testimony that a PHOSITA in April 2011 would have understood (as used in the claims of the patents-in-suit): (1) “new applicant entry” means “an applicant entry that has not previously been stored in the system memory;” and (2) “previous applicant entry” means “an applicant entry previously stored in the system memory.” Howell Decl., ¶¶42-44. Both are unquestionably used in the above-identified claims to differentiate the “applicant entry” being newly created in the software system (for the applicant and the position

the applicant is seeking in the organization, as recited in all independent claims) and at least one "applicant entry" previously created and already existing in the system (as recited in dependent claims 2, 6, and 10; all of which contain the language "searching for a previous applicant entry in the system memory associated with the applicant and a second organization….). Rylander Ex. 3, pp. 51-52, 115. Again, the specification describes an embodiment where, after the applicant entry is created, the system initially performs an internal check to determine if the applicant already has a prior entry from a different organization, or perhaps from an earlier background check with the same organization. Rylander Ex. 1, Col. 14:44-55; Col. 4:11-23; Col. 6:64-7:5; Figs. 35, 63.

## X. "Program Data" Group Of Claim Terms

| program data | data comprising information about one or more persons and/or organizations that may be useful to the system[22] |
|---|---|
| • '098 Patent: Claims 1, 2, 5, 6, 9, 10<br>• '188 Patent: Claims 2, 6, 9, 10 | |

The specifications state "[s]ystem memory typically includes an operating system, one or more applications, and program data [designated 724]….Program data may include applicant or organizational data that may be useful as has been further described above." Rylander Ex. 1, Col. 13:5-11; Fig. 62. For example, the specifications disclose that program data can include the applicant's name, date of birth, social security number, address, phone numbers, and the position applied for. *Id.* at Col. 6:58-64. As another non-limiting example, the specifications disclose that program data can include the names of other organizations having access to the system, their contact information, their point of contact, the prior positions (if any) applied for by the applicant, and the applicant's current status with the other organization. *Id.* at Col. 6:58-7:5. As a third non-limiting example, the specifications disclose that program data can include the names, addresses, email addresses, and phone numbers that the applicant supplies as references. *Id.* at Col. 8:17-20. And, as a fourth non-limiting example, the specifications disclose that program data can include law enforcement and court names, addresses, and phone numbers for a pre-defined radius around

[22] Defendants' initial/tentative proposed construction used the term "or" (not "and/or"). This has been re-phrased (for clarity) to eliminate any argument (nonsensical given the specifications and claims) that the data cannot comprise information about one or more persons and organizations.

the applicant's past and current addresses, and those addresses of the applicant's employer's and relatives. *Id.* at Col. 9:47-51.

The claims provide additional context. For example, claims 1, 5, and 9 of the '098 patent expressly refer to: (1) program data identifying the applicant, the position applied for, the organization offering the position, and the investigator conducting the background investigation on behalf of that organization; and (2) program data received from the applicant regarding a reference, including an email address associated with the reference. Claims 2, 6, and 10 also expressly refer to program data regarding the applicant and a previous background investigation conducted on the applicant by a different organization for a previous position in that organization. Ryland Exs. 1-2. "Program data" is thus "data comprising information about one or more persons and/or organizations that may be useful to the system."[23]

Plaintiff again never disclosed its proposed "plain and ordinary meaning" in the context of these patents. In fact, in its IPR Petition, Plaintiff argued "first set of program data" should <u>not</u> be accorded its "plain and ordinary meaning." Instead, Plaintiff advocated that claim language means "data comprising information about a person or an organization…"[24] Ryland Ex. 6, pp. 11-12, 14.

| first set of program data | a set of program data |
|---|---|
| • '188 Patent: Claim 9 | |
| second set of program data | a set of program data, distinct from the first set[25] |
| • '188 Patent: Claims 2, 6, 10 | |

[23] Given the context provided by claims 2, 6, and 10, Defendants' proposed construction (*i.e.*, "data comprising information about one or more persons and/or organizations") includes data regarding previous background investigations. However, if the Court disagrees, Defendants alternatively propose revised language, namely: "data comprising information about one or more persons, organizations, <u>and/or background investigations</u> that may be useful to the system."

[24] Similarly, in the Oklahoma action, Plaintiff argued "first set of program data" (which, as detailed below, means a set of program data) means "a collection of information identifying the applicant, the position, the first organization, and the investigator that is distinct from any other collection of information."[24] Rylander Ex. 7, pp. 11-12.

[25] "Distinct" is used in Defendants' proposed construction to signify that the "first set of program data" and the "second set of program data" are not completely identical. It is <u>not</u> meant to indicate that there is no overlap in data between the two sets. Indeed, claims 2, 6, and 10 of the '188 patent plainly contemplate that there <u>will</u> be some overlapping data – as the applicant is the same person (*i.e.*, information regarding the applicant, such as the applicant's name). Rylander Ex. 2.

The independent claims of the '188 patent (*e.g.*, claim 9) mention a "first set of program data." This set of program data is ordinally designated as the "first" set – but merely to distinguish it from the "second" set of program data recited in dependent claims 2, 6, and 8, respectively.[26] For example, in claim 9, the "first" set of program data comprises "information identifying the applicant, the position, the first organization, and the investigator;" and, in claim 10, the "second" set of program data comprises "information regarding the applicant, the second organization, the position the applicant applied for in the second organization, and the status of a previous application the applicant applied for in the second organization."[27] Rylander Ex. 2. Thus, the "first set of program data" is merely "a set of program data;" and the "second set of program data" is "a set of program data, distinct from the first set" (*i.e.*, not completely identical to the first set).

| reference set of program data | a set of program data regarding a reference source |
|---|---|
| • '188 Patent: Claim 9 | |

Claim 9 of the '188 patent recites "receiving an applicant electronic response with a reference set of program data, wherein the reference set of program data comprises <u>information regarding a reference source</u>, wherein the reference source is a person, <u>the program data including a reference email address associated with the reference source</u>" (emphasis added). Claim 9 also recites "determining a reference class of the reference source based on the reference set of program data." Rylander Ex. 2. Further, the '188 patent specification plainly discloses the supply of reference names, addresses, email addresses, and phone numbers by the applicant to the organization (as well as the subsequent generation of electronic documents to be made available to each identified reference source based on the class/type of each reference source). *Id.* at Col. 8:18-46; Col. 15:17-41. The above, especially when read together, clearly establish a "reference set of program data" is "a set of program data regarding a reference source."

---

[26] While claims 1, 5, and 15 of the '188 patent have been invalidated (in a different, Texas action), all dependent claims were specifically excluded from the Court's ruling.

[27] *See, e.g.*, the disclosed embodiment where the system may initially perform an internal check to determine if the applicant already has another applicant entry from a different organization (with a different set of program data), which may obviate the need to perform another background investigation. Rylander Ex. 1, Col. 14:44-55; Col. 4:11-23; Col. 6:64-7:5; Fig. 63.

## XI. "Electronic Documents" Group Of Claim Terms

| | |
|---|---|
| electronic documents | documents stored, transmitted, and/or accessed in digital form by a computing device[28] |
| • '098 Patent: Claims 1, 3, 4, 5, 7, 8, 9, 11, 12, 13<br>• '188 Patent: Claims 3, 4, 7, 8, 9, 11, 12 | |

The entirety of the specifications describe a web-based software system. For example, the specifications disclose that the software system allows an organization the ability to create and customize electronic documents (designated 104) to be sent to an applicant to complete via the system, and to be returned to the system in a similar fashion. Rylander Ex. 1, Col. 4:1-5; Col. 14:56-15:18. At least two embodiments are discussed. In the first, the system automatically generates portable document format (.pdf) versions of the documents and delivers them directly to the applicant (such as by email). In the second, an email transmission is sent to the applicant with an electronic invitation (such as a hyperlink) to return and login to the system and electronically "fill out" the electronic documents online. *Id.* at Col. 15:1-11. *See also*, Howell Decl., ¶46. The specifications also disclose options for an organization to create and customize electronic documents to be sent to references for them to complete and return via the system. Rylander Ex. 1, Col. 8:16-40 (*e.g.*, if an email address is provided for a reference, the organization can send the reference an email with a link to log into the software system, and the reference is presented with the documents the organization has selected for them to see and complete). *Id.* at Col. 15:19-38.

A PHOSITA in April 2011 would understand that every mention of "documents" in the specifications (including all variants thereof, such as "set of documents") means electronic documents. That "electronic" was an added modifier in several claims does not narrow the scope of the term "documents." It only makes explicit what a PHOSITA would understand from the software-system context of the patents. In other words, as a matter of usage in the field, a PHOSITA discussing a computer or software system would have referred to digital documents as

---

[28] Defendants' initial/tentative proposed construction used the term "or" (not "and/or"). This is not a substantive change, as Defendants have always been clear that one <u>or more</u> of the three activities (storage, transmission, or access) must occur in digital form. Howell Decl., ¶45. The change was made to avoid any argument (nonsensical given the specification and claims, and contrary to the Howell Declaration) that only one of the three can occur in digital form.

"documents" – and used "electronic documents" only where the context required distinguishing those digital documents from paper documents. What makes a document "electronic" is that it exists in digital form (*i.e.*, data that a computing device can store, transmit, and process), as distinct from a physical paper document. Howell Decl., ¶¶47-48. *See also*, Howell Decl., Ex. C; *Aortic Innovations*, 159 F.4th at 9 (when a patent repeatedly and consistently characterizes a claim term in a particular way, it is proper to construe a term in accordance with that characterization; a PHOSITA reading the patent would understand the very character of the invention requires a limitation to be part of every embodiment).

Thus, a PHOSITA in April 2011, after reading the specification, prosecution history, and claims, would have understood that "electronic documents" (as used in the claims of the patents-in-suit) means "documents stored, transmitted, and/or accessed in digital form by a computing device." This is consistent with the specifications – as in a first embodiment, above, the .pdf documents were generated and directly <u>transmitted</u> to the applicant in digital form; and, as in a second embodiment, above, the documents were <u>accessed</u> in digital form by the applicant after logging into the system to complete them online. The same is true of the documents made available to references (where the documents could be directly <u>transmitted</u> to the reference by email or <u>accessed</u> and completed online). The documents are also stored in digital form in the system memory. Each of these operations – storage, transmission, and/or access – is performed in digital form by a computing device.[29] Howell Decl., ¶¶45, 49-50. *See also*, Howell Decl., Ex. D.

| applicant set of electronic documents | one or more electronic documents made available to the applicant |
|---|---|
| • '098 Patent: Claims 1, 3, 4, 5, 7, 8, 9, 11, 12<br>• '188 Patent: Claims 3, 4, 7, 8, 9, 11, 12 | |

The specifications and claims make clear that "applicant set of electronic documents" means "one or more electronic documents made available to the applicant." Rylander Ex. 1, Col. 4:1-5; Col. 14:56-15:18; Figs. 13, 15; claims 1, 5, 9 ("transmitting an applicant hyperlink to an

[29] While Plaintiff has again failed to disclose its proposed "plain and ordinary" meaning in the context of these patents to Defendants, it has previously (and improperly) attempted to broaden "electronic documents" to include all "electronic files." Rylander Ex. 7, pp. 17-18, 19-20.

applicant email address associated with the applicant, the applicant hyperlink for viewing an applicant set of electronic documents"). *See also*, Rylander Ex. 2, claim 9. Critically, this proposed construction is sufficiently broad enough to include the one or more electronic documents initially selected by the system based on the position sought by the applicant, which can then be optionally changed by the organization (via their investigator) before being made available to the applicant. Rylander Exs. 1-2, claims 3, 7, 11 ("presenting to the investigator, prior to transmitting the applicant hyperlink for viewing the applicant set of electronic documents, an option of changing one or more documents in the applicant set of electronic documents").[30]

| reference set of electronic documents | one or more electronic documents made available to the reference/reference source |
|---|---|
| • '188 Patent: Claims 9, 13 | |

The specifications and claims also make clear that "reference set of electronic documents" means "one or more electronic documents made available to the reference/reference source." Rylander Ex. 2, Col. 8:18-42; Col. 15:17-41; Figs. 4, 26; claim 9 ("selecting a reference set of electronic documents based on the reference class of the reference source;" "transmitting a reference hyperlink to the reference email address, the reference hyperlink for viewing the reference set of electronic documents;" "receiving a reference electronic response to the reference set of electronic documents from the reference source"); claim 13 ("including a first questionnaire of the plurality of questionnaires in the reference set of electronic documents, the first questionnaire in one of the plurality of classes that is related to the type of reference source").[31]

---

[30] Given the context provided by claims 3, 7, and 11, Defendants' initial/tentative proposed construction ("one or more electronic documents made available to the applicant") includes the ability of the investigator to change one or more of the documents prior to transmitting the hyperlink. However, if the Court does not agree, Defendants alternatively propose revised language, namely: "one or more electronic documents <u>currently selected to be presented</u> to the applicant." *See*, *e.g.*, *Columbia*, 811 F.3d at 1370 (where dependent claims have no meaningful difference other than an added limitation, construing the independent claim to exclude material covered by the dependent claim would be inconsistent); *Kaneka*, 790 F.3d at 1304 (a claim construction that excludes a preferred embodiment is rarely, if ever, correct).

[31] Given the context provided by claims 3, 7, 9, and 11, Defendants' initial/tentative proposed construction ("one or more electronic documents made available to the reference source" includes the ability of the system to select a reference set of electronic documents based on the reference (footnote continued)

| | |
|---|---|
| first reference set of electronic documents | one or more electronic documents made available to the reference/first reference[32] |
| • '098 Patent: Claims 1, 5, 9, 13 | |

As previously discussed, several '098 patent claims contain the term "first reference" – even though no "second reference" appears in any issued claim – rendering the word "first" a vestigial artifact with no substantive meaning. The same is true of the word "first" in "first reference set of electronic documents" – as there is no "second reference set of electronic documents" in the issued claims. Rylander Ex. 1. *See also*, Rylander Ex. 3, pp. 40-56 (the December 9, 2014 Amendment/ Reply) (pending claims 5, 10, and 15 – all later cancelled in their entirety – amended to delete any mention of a second set of electronic documents). Thus, "first reference set of electronic documents" (in the claims of the '098 patent) has the same scope as "reference set of electronic documents" (in the claims of the '188 patent).

**XII. "Reference Class" Group Of Claim Terms**

| | |
|---|---|
| reference class | a category of reference/reference source, classified according to the relationship of the reference/reference source to the applicant, as identified by the applicant-supplied program data[33] |
| • '098 Patent: Claims 1, 5, 9<br>• '188 Patent: Claim 9 | |
| type of reference | Same as "reference class" |
| • '098 Patent: Claim 13 | |

---

class of the reference source (and the ability of the investigator to change one or more of the documents prior to transmitting the hyperlink). However, if the Court does not agree, Defendants alternatively propose revised language, namely: "one or more electronic documents <u>currently selected to be presented</u> to the reference/reference source."

[32] Defendants' initial/tentative proposed construction was "same as 'reference set of electronic documents.'" This has been re-phrased (for clarity) because the '098 claims use the terms "reference" and "first reference" (and not "reference source") – even though these terms all mean the same thing. Defendants also incorporate the comments concerning its alternative ("currently selected to be presented") language from the immediately preceding footnote (Footnote 31).

[33] Defendants' initial/tentative proposed construction included examples of reference classes (*e.g.*, relative, former employer) from the specification. They have been removed to avoid any potential juror confusion that the examples are somehow limiting. *See, e.g., Laryngeal Mask Co. v. Ambu A/S*, 618 F.3d 1367, 1371 (Fed. Cir. 2010). The second mention of "reference source" has also been changed to "reference/reference source" to make the construction grammatically parallel.

| type of reference source | Same as "reference class" |
|---|---|
| • '188 Patent: Claim 13 | |

A PHOSITA in April 2011 would have understood that "reference class" (as used in the '098 and '188 patent claims) means "a category of reference/reference source, classified according to the relationship of the reference/reference source to the applicant, as identified by the applicant-supplied program data." The same PHOSITA would have further understood "type of reference" and "type of reference source" (as used in the '098 and '188 patent claims, respectively) have the same meaning as "reference class"[34] Howell Decl., ¶¶57-59. *See also*, Howell Decl., Ex. D.

These constructions are supported by the specifications. Rylander Decl., Ex. 1, Col. 1:52-55; Col. 2:45-48; Col. 8:16-35; Col. 15:19-42; Figs. 3, 4, 25, 26, 54, 55. The specifications disclose a software system that uses program data (*e.g.*, names; email addresses) supplied by the applicant to build a reference file. *Id.* at. Col. 8:16-28; Col. 15:19-25; Col. 15, 28-30. The system is capable of displaying each reference/reference source identified by the applicant – classified according to the relationship of the reference/reference source to the applicant (*e.g.*, relatives, employers, former employers, supervisors, co-workers, neighbors, creditors). *Id.* at Col. 8:20-23; Col. 15:30-32; Figs. 4, 26 (Col 2:47-48: "a screen display showing difference reference types the system supports"); Figs. 54, 55 ("family member," "employer," "supervisor" all reference types).




***Fig. 26***

[34] "Type of reference" and "type of reference source" should be accorded the same construction, including because "reference" and "reference source" have the same meaning. *See*, Section VII, above. "Reference source" is only used in claims in the '188 patent.

The system then allows each reference/reference source to access the system and view a set of reference documents online via a hyperlink (the system alternately permits the organization to directly email .pdf versions of the set to the reference/reference source). The particular set of electronic documents each reference/reference source is intended to access/receive is, at least initially, based on the relationship of the reference/reference source to the applicant (*e.g.,* relatives are, at least initially, assigned one set of reference documents; former employers are, at least initially, assigned a different set of reference documents; creditors are, at least initially, assigned yet another set of reference documents). This is understandable, as the questions a relative may be asked are very different from the questions likely posed to a former employer. *Id.* at Col. 8:24-23; Col. 15:25-28; Col. 30-42; Figs. 3, 25 (Col. 2:45-46: "a screen display showing a page where documents can be associated with a certain type of reference").




***Fig. 3***

*See also*, Fig. 26 (stating, in relevant part, "Reference Documents are the documents your agency will use to communicate with the individuals listed in the applicant's questionnaire. A typical initial communication with a reference source would include a cover letter, the authorization to release information form that the applicant signed, and a questionnaire <u>with questions specific to the type of reference source (neighbor, family, personal, landlord, etc.</u>). [The system] has included <u>premade cover letters and premade questionnaire for each of these common reference sources</u>, shown below…") (emphasis added).

Defendants' proposed constructions are also supported by the '098 patent prosecution history. The "reference class" language was added to the proposed claims in the December 9, 2014 Amendment/Reply. Rylander Ex. 3, pp. 40-56. In the remarks, the patentee expressly stated that proposed claims 3, 8, and 13 (which issued as claims 1, 5, and 9), as then amended, "recite limitations in which a computing device receives from the applicant information about a reference (a person likely to have information regarding the applicant) including identity and email address. The computing device then uses that information to classify the first reference and then selects a set of documents based on the classification of the first reference." *Id.* at p. 49 (emphasis added).

The proposed constructions are further confirmed by the above-identified claims (including the context they provide). This is true for the independent claims of both the '098 and '188 patents (*e.g.*, "receiving an applicant electronic response with program data regarding a first reference…;" "determining a reference class of the first reference based on the program data regarding the first reference;" "selecting a first reference set of electronic documents based on the reference class of the first reference"), as well as each patent's dependent claim 13 (*e.g.*, "creating a plurality of questionnaires each being a member of at least one class of a plurality of classes of questionnaires, each class being related to a type of reference"). Rylander Exs. 1-2.

Plaintiff yet again fails to disclose its proposed "plain ordinary meaning." However, in the Oklahoma action, Plaintiff in 2021 argued that "reference class" means "a type of category of reference source grouped by a common characteristic distinguishing the reference source from other reference sources, such as a relative, former employer, or creditor." Rylander Ex. 7, pp. 16-17. Plaintiff thus conceded a "reference class" is a category of reference/reference source grouped according to a common characteristic (*e.g.*, whether they are a relative of the applicant; a former employer of the applicant; a creditor of the applicant). Plaintiff also at least implicitly conceded that "reference class" has the same meaning as "type of reference" and "type of reference source" (stating "reference class" means "a type of category of reference source…").[35] *Id.*

---

[35] Similarly, in its 2019 IPR Petition, Plaintiff argued that "reference class" should not be accorded its "plain and ordinary meaning." Instead, Plaintiff agreed that "reference class" should be construed to mean "a category of reference source having some property or attribute common and differentiated from other categories of reference sources." Rylander Ex. 6, pp. 13-15.

| | |
|---|---|
| determining a reference class | classifying the reference/reference source by type according to the applicant-supplied program data about the reference/ reference source, where the classification governs the selection of class-specific electronic documents for that reference/reference source[36] |
| • '098 Patent: Claims 1, 5, 9<br>• '188 Patent: Claim 9 | |

For the same reasons as detailed immediately above, "determining a reference class" means "classifying the reference/reference source by type according to the applicant-supplied program data about the reference/reference source, where the classification governs the selection of class-specific electronic documents for that reference/reference source." The reference class is determined by classifying the reference/reference source by type (*e.g.*, relatives, employers, former employers, supervisors, co-workers, neighbors, creditors) based on program data provided by the applicant – and that classification governs which set of electronic documents is selected by the system for that reference/reference source (as each class of reference/type of reference has its own pre-existing set of reference electronic documents).

## XIII. "Questionnaire" Group Of Claim Terms

| | |
|---|---|
| questionnaire | an electronic document that contains one or more questions |
| • '098 Patent: Claims 4, 8, 12, 13, 14<br>• '188 Patent: Claims 4, 8, 12, 13, 14 | |

A PHOSITA in April 2011 would have understood "questionnaire" (as used in the claims of the patents-in-suit) means "an electronic document that contains one or more questions." Howell Decl., ¶12. This is mandated by the specifications. Rylander Ex. 1, Col. Col. 5:55-6:9, Col. 8:16-40; Col. 14:59-63; Col. 15:19-22; Fig. 5; Fig. 6 ("Questionnaires are the documents with questions…"); Figs. 15, 27-31, 39, 60. Questionnaires are also differentiated from other electronic documents that typically do not contain any questions – such as "agreements" and "advisements."

[36] Defendants' initial/tentative proposed construction included "transmission to" after the phrase "electronic documents for." The currently proposed construction conforms more closely with the specification (*e.g.*, electronic documents may be made available to the reference via a hyperlink). "Reference source" has also been changed to "reference/reference source" given the claim language of the '098 patent (this is not substantive, as "reference," "first reference," and "reference source" have the same meaning). *See*, Section VII, above.

*Id*. Defendants' proposed construction is also supported by the 10 above-identified claims. Rylander Exs. 1-2 (*e.g.*, claims 4, 8, and 12 of both patents, all referencing a questionnaire and at least two questions contained therein – the "next question" and "a prior question").




*Fig. 6*

The specifications and claims also provide that a "questionnaire" (as used in the claims of the patents-in-suit) is an electronic document. Rylander Ex. 1, Col. 14:59-63. While Plaintiff may argue the specification suggests a questionnaire might eventually be printed and/or mailed, that does not mean questionnaires are not electronic documents (as, even if later printed/mailed, the questionnaire has already been <u>stored, transmitted, and/or accessed in digital form</u> by a computing device). Moreover, the context of the claims is dispositive. Claims 4, 8, 12 of both patents require the questionnaire be included in a set of <u>electronic documents</u>. These six claims all depend on a corresponding independent claim (claims 1, 5, 9, respectively) – which, in turn, all require that this set of <u>electronic documents</u> (and thus the questionnaire) be viewed using a <u>hyperlink</u> (again confirming the questionnaire must be an electronic document). Similarly, claims 13 and 14 of both patents require that a computing device perform the step of creating the questionnaires, and that at least the first questionnaire be included in a set of <u>electronic documents</u>. Rylander Exs. 1-2.

| | |
|---|---|
| inter-active questionnaire | a questionnaire where the use and/or content of at least one question depends on the answer to one or more prior questions[37] |

[37] Defendants' initial/tentative proposed construction again used the term "or" (not "and/or"). This has been re-phrased (for clarity) to eliminate any argument (nonsensical given the specifications) that, for example, both the use and content of at least one question in the questionnaire cannot depend on the answer to one or more prior questions.

- ‘098 Patent: Claims 4, 8, 12
- ‘188 Patent: Claims 4, 8, 12

A PHOSITA in April 2011 would have also understood that “inter-active questionnaire” (as used in the claims of the patents-in-suit) means “a questionnaire where the use and/or content of at least one question depends on the answer to one or more prior questions.” Howell Decl., ¶12.

Inter-active questionnaires are described in the specifications in only one location; namely, in connection with the software system’s questionnaire builder – where an organization can choose various styles of answers the respondent (*e.g.*, the applicant or a reference) can provide to each question. For example, if the respondent answers a particular question in a certain way (*e.g.*, answering “yes” to a yes or no question), the questionnaire can be set to ask additional sub-questions based on the response to the initial question. Conversely, if the respondent answers “no,” these additional sub-questions will never appear – eliminating the need for the respondent to see multiple questions that may not apply to the respondent’s situation due to the respondent’s answer to the initial question. Rylander Ex. 1, Col. 5:64-6:9; Figs. 5, 27-30. In other words, the specifications describe at least one situation where the use and/or content of at least one question depends on the answer to one or more prior questions.




*Fig. 5*

Defendants’ proposed construction is also supported by claims 4, 8, 12 of both patents. While the specific configuration recited in those dependent claims is arguably narrower in scope

than the term "inter-active questionnaire" alone (otherwise the claim language "next question presented….is based on a response to a prior question" could be superfluous), that claim language is consistent with Defendants' proposed construction (as that specific configuration falls within the scope of the proposed construction). Rylander Exs. 1-2.

Consistent with its evasive approach to claim construction, Plaintiff has yet again failed to disclose its proposed "plain ordinary meaning." However, it appears Plaintiff may attempt to use extrinsic dictionary definitions to argue an "inter-active questionnaire" is any questionnaire "characterized by conversational exchange of input and output, as when a user enters a question or command and the system immediately responds." However, using dictionaries as a starting point for claim construction is improper. Use of dictionaries is also independently improper here, especially without any supporting expert testimony or intrinsic evidence (none was disclosed), as the meaning of "inter-active questionnaire" is clear from the intrinsic record. Even ignoring these fatal flaws, any such dictionary-driven construction also plainly conflicts with the specifications and claims – as the patents-in-suit describe questionnaires that are made available to applicants and references in finalized form (*i.e.*, there is no mention in the specifications, prosecution histories, or claims of any ability for the system to immediately respond to an applicant's and/or reference's answer, other than what has been pre-programmed into the questionnaire, let alone in a conversational manner like a chat). It thus appears Plaintiff intends to improperly start with a purported dictionary definition, and then largely (or entirely) ignore the intrinsic evidence, in an attempt to justify its unsupported (and inaccurate) contention that claims 4, 8, and 12 are invalid.

| classes of questionnaires | groupings of one or more questionnaires related by the type of intended respondent[38] |
|---|---|
| • '098 Patent: Claim 13<br>• '188 Patent: Claim 13 | |

---

[38] Defendants' have added the phrase "one or more" to their initial/tentative proposed construction for additional clarity, as the specifications and claims never require multiple questionnaires in any class. This addition also clarifies the term "groupings" in its proposed construction. *See, e.g.*, *UTTO Inc. v. Metrotech Corp.*, 119 F.4th 984, 996-97 (Fed. Cir. 2024) (discussing that "group" can mean one or more, not two or more). Defendants have also changed "grouping" to "groupings" for purposes of English grammar. Alternately, Defendants would propose that a "class of questionnaire" (singular) means "a grouping of one or more…."

It would also have been understood by a PHOSITA in April 2011, especially given the specification and claims, that a "class" of questionnaire refers to "a grouping of one or more questionnaires related by the type of intended respondent." Howell, ¶54. Further, because claim 13 of each patent only mentions references/reference sources (and not the applicant), a "class" of questionnaires (in those claims) clearly refers to one or more questionnaires related by the type of reference/reference source (*e.g.*, relatives, employers, neighbors, creditors) intended to respond to the questionnaire. *See also*, Rylander Ex. 4, pp. 191-92 ("classifying based on type of reference").

As detailed in several sections above, the specifications provide that a set of electronic documents (including one or more questionnaires therein) can be created (in advance) for each type of reference/reference source (a set the organization, via the investigator, can optionally add to, delete from, and/or edit before they are made available to the reference). And, as also detailed above, those sets (including one or more questionnaires contained in each set) are created for each type of reference/reference source (*e.g.*, neighbor; creditor; past employer) because each reference type likely has different information about the applicant (*e.g.*, a neighbor likely knows different information than a creditor, who likely knows different information than a past employer).[39]

## XIV. "Suggested Reference List" Group Of Claim Terms

| suggested reference list | a list of one or more potential references/reference sources suggested by the system, including one or more agencies and/or courts[40] |
| --- | --- |
| • '098 Patent: Claims 1, 5, 9<br>• '188 Patent: Claim 9 | |

---

[39] That, however, does not preclude the same questionnaire from being a member of multiple classes of questionnaires (*e.g.*, a supervisor and a co-worker could be assigned to answer at least one identical questionnaire). *See*, claim 13 of the '098 and '188 patents (creating a plurality of questionnaires each being a member of <u>at least one class</u> of a plurality of classes of questionnaire, each class being related to a type of reference). Rylander Exs. 1-2.

[40] Defendants' have again added the phrase "one or more" to their initial/tentative proposed construction for additional clarity – as neither the specifications nor claims ever require the inclusion of multiple references/reference sources in any list. The same is true for Defendants' addition of the term "potential" – as there is no requirement that a listed agency or court actually be invited to provide information regarding the applicant. "References" was also changed to "references/ reference sources" given the '188 patent claim language. Finally, "law enforcement" was removed, as that limitation is added by subsequent language in the above-identified claims.

The specifications describe a feature (called "Address Locator") that can retrieve agency and court names, addresses, and phone numbers for a pre-defined radius around the applicant's past and current addresses, and those addresses of the applicant's employer's and relatives. Rylander Ex. 1, Col. 9:46-51. The system does this by taking the address information the applicant provided on questionnaires he/she submitted to the organization via the same software system. The system can then conduct a search using an Internet search engine for agencies and courts around the selected address. A list of agencies and courts is then presented to the user, at which time the organization selects the agencies and courts to whom the organization will send reference letters and requests for records checks. *Id.* at Col. 9:52-60; Figs. 58, 59. *See also*, Rylander Ex. 4, pp. 145-47 (the October 23, 2017 Reply/Amendment) (citing the same portion of the specifications). Nowhere in the specifications, claims, or prosecution histories is it ever suggested (let alone disclosed) that the suggested reference list could instead be generated by a human using a search engine (or by anything other than the system). Indeed, the specifications and '098 patent claims are clear that the investigator is only involved in this court/agency process after being presented with the suggested reference list. Moreover, there would be no reason to present the investigator with the list if the investigator compiled/prepared the list. Rylander Ex. 1.




*Fig. 58*

It would have thus been clear to a PHOSITA in April 2011, given the specifications and claims, that "suggested reference list" means "a list of one or more potential references/reference sources suggested by the system, including one or more agencies and/or courts."[41]

---

[41] In the Oklahoma action, Defendants proposed (prior to their additional review of the intrinsic (footnote continued)

| | |
|---|---|
| generating a suggested reference list | a computer-implemented operation that automatically generates a suggested reference list based on a distance threshold, fixed in advance, between an address associated with the applicant and one or more agencies and/or courts[42] |
| • '098 Patent: Claims 1, 5, 9<br>• '188 Patent: Claim 9 | |

As just detailed, the specifications disclose the agencies and/or courts are: (1) identified by the software system (one or more components of which are implemented by a computing device); and (2) fall within a distance threshold from a certain address (*e.g.*, a radius from the applicant's current address, the applicant's past address, the address of applicant's employer, or the address of applicant's relative). Rylander Ex. 1, Col. 3:54-56; Col. 9:46-60; Figs. 58, 59, 62. As also just detailed: (1) the suggested list is automatically generated by the system (not a human); and (2) the distance is fixed in advance (*e.g.*, the radius is pre-defined). *Id.*[43] This is the only disclosed embodiment (and examples). *See, e.g.*, *The Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296, 1309 (Fed. Cir. 2017) (the only disclosed embodiment is highly indicative of claim scope; court limited claim term to embodiment as the only description in the specification that cast light on what that team means and that enables a PHOSITA to achieve the objects of the claimed invention).

---

and extrinsic evidence for this action) that "suggested reference list" meant "a list of references suggested by the system." Plaintiff disagreed, asserting that Defendants' 2021 proposed construction was "overly broad" and ignored "the context of the claims in which the term appears." Instead, Plaintiff asserted that "suggested reference list" means "a list of one or more recommended law enforcement agencies presented to the user." Rylander Ex. 7, pp. 21-22. Unlike Defendants, who have further studied the specification and the context of the claims, Plaintiff simply wants to completely ignore its prior position/argument – and broadly argue an undisclosed "plain and ordinary meaning."

[42] Defendants have modified their initial/tentative proposed construction to incorporate their construction of "suggested reference list" (thus clarifying and simplifying the construction) and to respond to Plaintiff's untimely amended invalidity contentions (served months late on the day of the tentative construction exchange). Rylander Ex. 9. Other language was removed ("residential;" "law enforcement") to avoid any argument that subsequent language in the claims is superfluous.

[43] "The software system contains a feature that will retrieve law enforcement and court names, addresses….for a pre-defined radius around applicant's past and current addresses, and those addresses of the applicant's employer's and relatives. The system does this by taking the address information….The system then conducts a search…for agencies and courts around the selected address. A list of agencies and courts is presented to the user…" (emphasis added).

Dated: July 29, 2026

Respectfully submitted,

RYLANDER & ASSOCIATES PC
LEWIS BRISBOIS BISGAARD & SMITH LLP

By: *_/s/ Kurt M. Rylander_*
Kurt M. Rylander

Attorneys for Defendants,
MILLER MENDEL, INC. and TYLER MILLER